**Maude E. McDONALD, et al.,
Plaintiffs-Appellants,**

v.

**James G. WATT, etc., et al.,
Defendants-Appellees.**

No. 80–3155.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 21, 1981.

McDade & Lee, James W. McDade, Washington, D. C., Gerald, Brand, Watters, Cox & Hemleben, Robert M. Logan, Jr., Jack W. Brand, Jackson, Miss., Craig R. Carver, Denver, Colo., for plaintiffs-appellants.

Robert E. Hauberg, U. S. Atty., Jerry A. Davis, Asst. U. S. Atty., Jackson, Miss., Barry Stuart Sandals, James W. Moorman, Asst. Atty. Gen., Appellate Section, Land and Natural Resources Div., Edward J. Shawaker, Kathryn A. Oberly, Margaret E. Weeks, Attys., Dept. of Justice, Washington, D. C., for defendants-appellees.

Jack M. Weiss, Thomas F. Duchen, New Orleans, La., for amicus curiae Collins C. Diboll.

Pat H. Scanlon, Powell G. Ogletree, Jackson, Miss., for intervenor Robert E. Thames.

Before SKELTON *, Senior Judge, and RUBIN and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiffs here challenge a decision of the Department of Interior on the entitlement to a mineral lease of government land. While government officials are named as party defendants, this suit is essentially a contest between private parties—plaintiffs and intervenor—for the lease. The central question is whether the Department's interpretation of an administrative regulation should be applied retroactively or prospectively only. The Department and the district court held that the regulation was unambiguous, and that therefore the Department's interpretation was fully applicable in the administrative adjudication of the private parties' dispute. Since we conclude not only that the regulation is ambiguous but also that the Department's interpretation was a reversal of a well established agency practice on which plaintiffs and hundreds of other oil and gas lease applicants reasonably relied, we reverse and hold that the rule should be given prospective effect only.

I. *Background*

The Mineral Lands Leasing Act authorizes the Secretary of Interior to lease wildcat oil and gas lands on a non-competitive basis. 30 U.S.C. § 226(a), (c). The Act expressly "entitles" the "first" "qualified" applicant to a lease.[1] In order to determine

---

* Senior Judge of the U.S. Court of Claims, sitting by designation.

1. The Act provides in pertinent part:

which applicant is "first," the Secretary operates a "simultaneous filing program." Under the program, a list of available lands is posted monthly. Those who submit an offer[2] during the short filing period are considered to have filed simultaneously. See 43 C.F.R. § 3112.1–2 (1979).[3] A drawing is held, and the maker of the first offer drawn is awarded the lease, provided that he is "qualified." See id. § 3112.2–1(a)(3).

### A. The McDonald-Walsh Filing

Plaintiff Stewart Capital Corp. ("Stewart") is a "filing service"; among its other functions, it files offers in lease drawings for its customers. In the fall of 1976, it was Stewart's usual practice to affix its customer's facsimile signature on an offer in order to avoid the logistical problem of having each customer sign personally. In late October of 1976, it filed an offer with the facsimile signatures of plaintiffs Maude McDonald and Harriet Walsh. Stewart's name did not appear on the offer.

At a drawing held on November 5, 1976, McDonald and Walsh's offer was drawn first. Intervenor Roy Thames' offer was drawn second. Thames filed a protest. He argued that McDonald and Walsh's offer was not "qualified" because it was not accompanied by certain statements of interest required "[i]f the offer is signed by an attorney in fact or agent." 43 C.F.R. § 3102.6–1(a)(2) (1979).[4] McDonald, Walsh and Stewart, claiming reliance on prior administrative decisions and practice, as well as the history of the "accompanying statements" regulation, argued that offers bearing facsimile signatures were not "signed by" an agent but were signed by the offerors themselves.

### B. Prior Rules, Decisions and Practice

To provide a better understanding of the Department's disposition of Thames' protest, we think it helpful at this point to examine the history, decisions, and practice on which plaintiffs claimed reliance. Prior to 1964, the "accompanying statements" regulation provided in pertinent part:

> If the offer is signed by an attorney in fact or agent, or if any attorney in fact or agent has been authorized to act on behalf of the offeror with respect to the offer or lease, [the offer shall be accompanied by] separate statements over the signatures of the attorney in fact or agent and the offeror stating whether or not ... the attorney in fact or agent ... has received, or is to receive, any interest in the lease when issued ....

19 Fed.Reg. 8835, 9014 (1954) (codified as amended at 43 C.F.R. § 192.42(e)(4)(i) (1954 & Cum.Supp.1962)) (emphasis added).[5] The

---

If the lands to be leased are not within any known geological structure of a producing oil or gas field, the person first making application for the lease who is qualified to hold a lease under this chapter shall be entitled to a lease of such lands without competitive bidding.

30 U.S.C. § 226(c).

2. The offer must be submitted on an approved form, referred to in administrative parlance as a "simultaneous oil and gas drawing entry card," or "DEC." Since "[t]he entry card ... constitute[s] the applicant's offer," 43 C.F.R. § 3112.2–1 (1979), throughout this opinion we use the single term "offer" for the sake of clarity and simplicity.

3. Unless otherwise indicated, our references are to the 1979 edition of the Code because the regulations at issue have been substantially rewritten to deal with the very issues involved in this case. See 45 Fed.Reg. 35156 (1980) (codified in scattered sections of 43 C.F.R. §§ 3100–3112 (1980)).

4. The regulation provided in pertinent part:

If the offer is signed by an attorney in fact or agent, it shall be accompanied by separate statements over the signatures of the attorney-in-fact or agent and the offeror stating whether or not there is any agreement or understanding between them or with any other person, either oral or written, by which the attorney in fact or agent or such other person has received or is to receive any interest in the lease when issued, including royalty interest or interest in any operating agreement under the lease, giving full details of the agreement or understanding if it is a verbal one. The statement must be accompanied by a copy of any such written agreement or understanding.

43 C.F.R. § 3102.6–1(a)(2) (1979).

5. The remaining language of the pre-1964 regulation was essentially identical to the language of the post-1964 regulation set out in note 4 supra.

italicized language in the pre-1964 regulation made it clear that the statements of interest were required whenever an agent was authorized to act "with respect to" an offer, whether or not the agent participated in its signing. In 1959, however, the agency adopted the "sole party in interest regulation," requiring the offeror to state directly whether he was the sole party with an interest in the offer and lease, and, if not, to disclose the names of all other interested parties. 24 Fed.Reg. 281, 282 (1959) (codified as amended at 43 C.F.R. § 192.-42(e)(3)(iii) (Cum.Supp.1962)).[6] The offeror and the other interested parties were further required to submit a separate statement, setting forth the nature and extent of the interest of each, within 15 days after the filing of the offer. *Id., as amended by* 26 Fed.Reg. 3420, 3422 (1961). This new procedure duplicated, to a certain extent, the regulation requiring accompanying statements of interest by agents;[7] if an agent did have an interest, he and the offeror would be required to disclose it through the "sole party in interest" procedure.

In order to reduce the duplication,[8] the Department amended the "accompanying statements" regulation in 1964 by deleting the language italicized above:

> If the offer is signed by an attorney in fact or agent, it shall be accompanied by separate statements over the signatures of the attorney in fact or agent and the offeror . . . .

29 Fed.Reg. 2502, 2503 (1964) (codified at 43 C.F.R. § 3123.2(d)(1) (1965)) (pertinent version at 43 C.F.R. § 3102.6–1 (1979)). The amendment eliminated the need for accompanying statements in a broad class of filings involving "undisclosed" agents. Henceforth, accompanying statements would be required in only one instance— when the offer was "signed by" the agent. No matter how great an agent's involvement in a transaction, no accompanying statements would be required unless the offer was "signed by" the agent.

More than one inference could have been drawn from this amendment of the regulation's language. One possible interpretation was that the regulation was now concerned with agent-formulated offers that never passed through the offeror's hands. There was nothing in the regulation, however, to prevent the offeror from signing

**6.** With the exception of clarifying word changes, the language of this regulation has remained essentially unchanged. It requires: A signed statement by the offeror that he is the sole party in interest in the offer and the lease, if issued; if not he shall set forth the names of the other interested parties. If there are other parties interested in the offer a separate statement must be signed by them and by the offeror, setting forth the nature and extent of the interest of each in the offer, the nature of the agreement between them if oral, and a copy of such agreement if written. All interested parties must furnish evidence of their qualifications to hold such lease interest. Such separate statement and written agreement, if any, must be filed not later than 15 days after the filing of the lease offer. 43 C.F.R. § 3102.7 (1979).

**7.** We do not suggest that the requirements of the two regulations were exactly the same. To be sure, the "accompanying statements" regulation required the agent himself to state "whether or not" he had an interest; the "sole party in interest" regulation required only the offeror's "whether or not" statement. Moreover, once an agent stated that he did have an interest, the "accompanying statements" regulation required him to provide certain additional information. Nevertheless, both regulations required the same basic information: a statement of the interest of the agent.

**8.** In its notice of proposed rulemaking, the Department stated that "[t]he primary purpose of these amendments is to facilitate processing of oil and gas lease offers simultaneously filed . . . . The amendments will also delete certain obsolete provisions." 28 Fed.Reg. 10883 (1963). Moreover, the final rule was promulgated shortly after the promulgation of a new rule broadly defining an "interest" for the purposes of the "sole party in interest" regulation. 29 Fed.Reg. 1437 (1964) (originally designated for codification at 43 C.F.R. § 192.43a) (codified as a "definition" at 43 C.F.R. § 3100.0–5(b) (1979)). It seems likely that this strengthening of the "sole party in interest" regulation was related to the amendment of the "accompanying statements" regulation two weeks later. *See* D. E. Pack, 85 Interior Dec. 409, 427–28, 30 I.B.L.A. 23, 61–64 (1978) (on reconsideration) (Frishberg, Ch. A.L.J., dissenting in part), *aff'd in part and rev'd in part sub nom. Runnells v. Andrus,* 484 F.Supp. 1234 (D.Utah 1980).

blank offers in advance and having the agent fill the terms in later;[9] thus, the purpose of ensuring that the offeror reviews the offer could easily have been circumvented without violating the regulation. A second possible interpretation was that the regulation was now concerned only with offers on which the agent's name appeared; *i.e.*, when the offer was signed "O, offeror, by A, agent." This interpretation is also problematic.[10]

Whatever the relative merits of these two interpretations, when McDonald and Walsh filed their offer every existing administrative statement concerning the regulation favored the latter one.

The Secretary first interpreted the revised regulation in A.M. Shaffer, 73 Interior Dec. 293 (1966).[11] *Shaffer* did not directly involve the question whether an agent had "signed" within the meaning of the regulation, but rather whether the person who had signed was indeed an "agent." In *Shaffer*, the persons signing the offers purported to be the offerors; their offers stated, however, that one D. E. Sanburg would acquire an interest. Pursuant to the sole party in interest regulation, they filed statements within 15 days declaring that they were actually agents for Sanburg, and that Sanburg owned a 100% interest in the offer and lease. The Secretary decided that the "accompanying statements" regulation was not clearly applicable to the Shaffers because they had signed as principals, not agents. The Secretary pointed out that the Shaffers had signed the signature line designated for a "lessee" rather than that designated for an attorney in fact or agent. *Id.* at 330 n.3. The Secretary reasoned that since the Shaffers were fully chargeable with the obligations of the offer and lease, and since they had fully disclosed all interests in the lease, "neither the letter nor the spirit of the agency regulation ha[d] been clearly violated." *Id.* at 300. The regulation could be reasonably interpreted by offerors "as covering only situations where the principal is named as the offeror and the agent signs the offer *expressly* as his agent." *Id.* (emphasis added). To apply the regulation to the situation in *Shaffer*, the Secretary said, would require its amendment. *Id.* at 301.

While *Shaffer* does not deal with the question presented here, it does represent an extremely narrow interpretation of the regulation. More importantly, the Secretary's statement that the regulation applied only when the agent signs the offer "expressly" as agent could be read to say that a statement of interest was required only when an agent's name appeared on the agent's signature line.

Further support for plaintiffs' reading of the regulation came in Mary I. Arata, 78 Interior Dec. 397, 4 I.B.L.A. 201 (1971). To be sure, *Arata* did not involve the regulation concerning agents' statements; rather, it involved the meaning of the word "signed" under a related regulation requiring each offer to be "signed" by the offeror or his agent, 43 C.F.R. § 3112.2–1(a) (1979) (then 43 C.F.R. § 3123.9(c) (1970)).[12] Mrs.

9. *See* D. E. Pack, 85 Interior Dec. 409, 426–27, 429, 38 I.B.L.A. 23, 60–61, 66 (1978) (on reconsideration) (Frishberg, Ch. A.L.J., dissenting in part), *aff'd in part and rev'd in part sub nom. Runnells v. Andrus*, 484 F.Supp. 1234 (D.Utah 1980).

10. One possible rationale for this interpretation is that the agency wanted additional assurances concerning interests in the lease whenever it was put on notice that an agent was involved. *See* D. E. Pack, 85 Interior Dec. 409, 428, 38 I.B.L.A. 23, 64 (1978) (on reconsideration) (Frishberg, Ch. A.L.J., dissenting in part), *aff'd in part and rev'd in part sub nom. Runnells v. Andrus*, 484 F.Supp. 1234 (D.Utah 1980). It is difficult to understand, however, why the need for additional disclosures should hinge on the Department's awareness of the agent's involvement. In any event, we find it hard to imagine exactly what the Department had in mind when it rested the need for such additional disclosures of an agent's interest on his act of "signing" the offer.

11. The *Shaffer* decision was written by an Assistant Solicitor of the Department. In legal effect, his decision is that of the Secretary. *See Robertson v. Udall*, 349 F.2d 195, 197 n.4 (D.C.Cir.1965).

12. The regulation provided that "[o]ffers to lease ... must be ... signed and fully executed by the applicant or his duly authorized agent in his behalf." 43 C.F.R. § 3112.2–1(a) (1979).

Arata had personally stamped her facsimile signature on an offer rather than signing it in ink. The Interior Board of Land Appeals ("IBLA") held that this was sufficient. "The law is well settled that a printed name [*sic*] upon an instrument with the intention that it should be the signature of the person is valid and has the same effect as though the name were written in the person's own handwriting." 78 Interior Dec. at 398.

While *Arata* did not directly involve the question whether an agent could stamp the principal's signature as long as the principal "inten[ded] that it should be [his] signature," the IBLA phrased the holding of *Arata* in language requiring only that the offeror intend the stamp to be his signature, not that the offeror actually do the stamping. Following *Arata*, it became the practice of the Bureau of Land Management ("BLM"), the departmental branch responsible for day-to-day administration of the leasing program, to apply this "intent" test for purposes of testing the qualifications of a rubber-stamped offer. When an offer with a facsimile signature was drawn first, the BLM would inquire whether the offeror intended the stamp to be his signature. If the offeror filed an affidavit declaring that this was his intent, the BLM did not disqualify the offer for lack of an accompanying statement, even if it was an agent who affixed the stamp.[13]

Thus, when McDonald and Walsh filed their lease offer, they had good reason to believe that they did not have to file an accompanying statement. *Shaffer* supported their belief that no agent had "signed" the offer within the meaning of § 3102.6–1(a)(2); *Arata* supported their belief that the facsimile stamp operated as their own signatures. On the basis of these precedents, the BLM had sanctioned Stewart's filing procedure for more than four years.

### C. *McDonald-Walsh and Pack*

Consistent with its practice, the Eastern States Office of the BLM dismissed Thames' protest on March 14, 1977. On May 19, 1977, however, the IBLA handed down its first decision in D. E. Pack, 84 Interior Dec. 192, 30 I.B.L.A. 166 (1977) ("*Pack I*"). In *Pack I*, the IBLA disapproved the BLM's practice, holding that an accompanying statement was required whenever an agent affixed the facsimile signature for his principal. The offeror did not always have to sign personally, the IBLA said; if the facsimile were affixed by an "amanuensis," one whose sole function was to affix the signature at the direction of the offeror, then accompanying statements were not required. But if the facsimile were affixed by an "agent," one with discretionary authority in the formulation of the offer, then the offer had to be accompanied by statements of interest. The IBLA believed that an "agent," such as Stewart, could not be converted into an "amanuensis" for the purpose of affixing the facsimile, even if he had done so at the direction of the offeror. *See* 84 Interior Dec. at 195–96. Therefore, in *Pack I*, the IBLA held the lease offer of Runnells, another Stewart customer, to be "unqualified," and it awarded the lease to the second offer drawn.

On July 5, 1977, the IBLA, following its decision in *Pack I*, reversed the BLM's dismissal of Thames' protest. Ray H. Thames, 31 I.B.L.A. 167 (1977). On September 30, 1977, this action was filed. It was held in abeyance while the IBLA, at the direction of the Secretary, was reconsidering *Pack I*. On November 9, 1978, the IBLA reaffirmed *Pack I* and rejected the argument, supported by the BLM itself, that the rule of *Pack* should be applied prospectively only. D. E. Pack, 85 Interior Dec. 409, 38 I.B.L.A. 23 (1978) (on reconsideration) ("*Pack II*"). In *Pack II*, the IBLA acknowledged a responsibility to limit new rules to prospective effect when the regulation at issue is ambiguous, *id.* at 418, 38 I.B.L.A. at 42; it held, however, that the "accompanying statements" regulation was entirely unambiguous, and that Stewart's interpretation was "bizarre and unreasonable." *Id.*, 38 I.B.L.A. at 43. It recognized that the BLM

---

**13.** For a discussion of the evidence concerning the BLM's practice, see note 22 *infra*.

agreed with Stewart's interpretation, but held that the BLM's practice did not require it to refrain from retroactive application of the new rule because the BLM's practice was not an "official decision." *Id.* at 420–21, 38 I.B.L.A. at 45–47.

Following *Pack II*, the court below granted defendants' motion for summary judgment on January 28, 1980. On February 19, 1980, a federal district court in Utah upheld the rule of *Pack* but held that it could not be applied retroactively to the *Pack* case itself and enjoined the Department from applying it to any other lease offer filed before November 9, 1978, the date of the final decision in *Pack II*. *Runnells v. Andrus*, 484 F.Supp. 1234, 1237–40 (D.Utah 1980). A district court in Wyoming has followed *Runnells*. *Stewart Capital Corp. v. Andrus*, No. C79–123K (D.Wyo. April 24, 1980), *appeal pending*, No. 80–1642 (10th Cir.). The government's acquiescence in *Runnells* and *Stewart Capital* is demonstrated by its confession of error on the issue of retroactivity in this court [14] and by the IBLA's recent decision in Killian L. Huger, Jr., 52 I.B.L.A. 174, 177 (1981). Thus, McDonald and Walsh remain members of a select, unfortunate group: those whose offers were rejected pursuant to the final administrative decision in *Pack* and whose appeals were heard by the IBLA prior to the court decision in *Runnells*.

II. *New Pack Construction Approved*

On this appeal, plaintiffs argue that the *Pack* rule is arbitrary and capricious and that its formulation was an improper exercise in administrative "rulemaking" by adjudication. It is clear, however, that these arguments are not substantial; the central issue is whether the agency should have applied the rule to offers filed before its decision in *Pack I*.

■ We have little difficulty in concluding that the IBLA's interpretation of the regulation in *Pack* was a reasonable one. We must give even greater deference to an agency's interpretation of its own administrative regulation than we would to its interpretation of the statute it is charged with administering. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). We think that it was reasonable for the IBLA to conclude that when an agent places the offeror's facsimile signature on an offer, the offer is "signed by" the agent within the meaning of the regulation. The purpose of the regulation, according to the IBLA, is to ensure that the named offeror is the actual offeror by requiring the statements of both the offeror and the agent. Reliance on the "sole party in interest" regulation is inadequate, the IBLA reasoned, since its procedure requires only the statement of the offeror concerning the absence of interests in any other party. The offeror's statement is inadequate when an agent stamps the form because of the danger that the agent may be manufacturing the offeror or acting without his prior consent. *See Pack II*, 85 Interior Dec. at 418–19, 38 I.B.L.A. at 43–44. Such unscrupulous rubber-stamp wielders could defeat an important purpose of the noncompetitive leasing program—"that all offerors ... shall have an equal opportunity for success in the drawings to determine priorities." 43 C.F.R. § 3100.0–5(b) (1979). The IBLA's conclusion that this danger would be alleviated by requiring the accompanying statements of both the putative offeror and the agent was not unreasonable, arbitrary, or capricious.

■ Nor can we agree with plaintiffs' contention that the IBLA engaged in "rulemaking" without following the requirements of the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 552(a)(1)(D), 553. While the courts have experienced difficulty in articulating a "bright line" distinction between "rulemaking" and "adjudication,"

---

14. The government's confession is not based on any concession on the merits of the retroactivity issue but on a desire to restore uniform treatment of all lease applicants in light of its decision not to appeal the *Runnells* and *Stewart Capital* cases. In fairness to intervenor Thames, however, we do not accept the government's confession of error. We consider the issues as if the government were continuing to defend its original position on the issue of retroactivity.

*see* 2 K. Davis, Administrative Law § 7:2 (2d ed. 1979), we have no doubt that the Department properly used its adjudicatory procedures in resolving the dispute between these contestants. The existence of a dispute concerning particular individuals is a distinguishing characteristic of adjudication. *See United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973). The adjudication of Thames' protest was not converted into an exercise in "rule-making" when the IBLA applied an existing regulation, passed in compliance with APA procedures, to a particular set of facts. Its decision that an offer stamped by an agent is "signed by" the agent within the meaning of § 3102.6–1, while inconsistent with the practice of the BLM and arguably inconsistent with the reasoning of prior decisions, did not overrule any previous decision to the contrary; in fact, when the IBLA decided Thames' protest, the only previous case on point was *Pack I*, a precedent the IBLA was bound to follow.[15]

In *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court held that the decision to make new law through rulemaking or adjudication "is one that lies primarily in the informed discretion of the administrative agency." *Id.* at 203, 67 S.Ct. at 1580. To hold that the agency abused this discretion by not following the rulemaking provisions of the APA in this case would rigidify the administrative decisionmaking process far beyond the permissible bounds outlined in *Chenery.*

## III. *Only Prospectively*

Having concluded that the legal rule followed in this case was properly established through adjudication, we turn to the related but separate question whether the agency should have applied the rule to this case. While at one time the determination that a rule was properly established through adjudication would have compelled the conclusion that it should be applied with full retroactive effect, *see Linkletter v. Walker*, 381 U.S. 618, 622–24, 85 S.Ct. 1731, 1734–35, 14 L.Ed.2d 601 (1965), "the accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective." *Id.* at 628, 85 S.Ct. at 1737. The Department itself has recognized this very principle in its own adjudications; since 1917, it has refused "to give its later decisions retroactive effect, especially when to do so would adversely affect actions taken and rights and interests acquired by private persons on the faith of the earlier decisions and would inure to the benefit of other private persons." *Safarik v. Udall*, 304 F.2d 944, 949 (D.C.Cir.) (collecting administrative decisions), *cert. denied*, 371 U.S. 901, 83 S.Ct. 206, 9 L.Ed.2d 164 (1962).[16] In *Safarik*, the Court of Appeals for the District of Columbia Circuit upheld the Department's power to give its decisions prospective effect only. *Id.* at 950.[17]

---

**15.** We emphasize that the question whether *Pack* itself was an improper exercise in "rulemaking"—a question answered in the negative by the court in *Runnells*, 484 F.Supp. at 1237—is not before us. Moreover, even if *Pack* were an improper "rulemaking," that would not compel the conclusion that this case was not a proper adjudication. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 762–66, 89 S.Ct. 1426, 1428–30, 22 L.Ed.2d 709 (1969) (plurality opinion) (opining that a prior administrative decision was an improper "rulemaking," but nevertheless concluding that the same rule could be formulated and applied in a subsequent case since that case itself was an "adjudication").

**16.** As mentioned earlier, the IBLA acknowledged this very principle in *Pack II. See* 85 Interior Dec. at 418, 38 I.B.L.A. at 42.

**17.** *But cf. NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). In *Wyman-Gordon*, six Justices concluded that the establishment of a rule in a prior NLRB adjudication had been an impermissible exercise in "rulemaking." In so concluding, the six Justices relied heavily on the fact that the NLRB had decided to give the rule prospective effect only. *Id.* at 765, 89 S.Ct. at 1429 (plurality opinion); *id.* at 775–77, 89 S.Ct. at 1434–35 (Douglas, J, dissenting); *id.* at 780, 89 S.Ct. at 1437 (Harlan, J., dissenting). We do not believe, however, that *Wyman-Gordon* represents a general prohibition against applying new adjudicatory rules prospectively. First, while the plurality opinion gave great prominence to its view that the earlier proceeding was not an "adjudication," *see id.* at 762–66, 89 S.Ct. at 1428–30, its statements were dicta since it up-

In *Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380 (D.C.Cir. 1972), the same court went a step further and held that, under some circumstances, a reviewing court could require an agency to give a rule established by adjudication prospective effect only. The court adopted the balancing test enunciated by the Supreme Court in *Chenery*: " '[The effects of] retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles.' " 466 F.2d at 390 (quoting *SEC v. Chenery Corp.*, 332 U.S. at

203, 67 S.Ct. at 1581). The court further held that the application of this test "is in each case a question of law, resolvable by reviewing courts with no overriding obligation of deference to the agency decision." *Id.* at 390.

While we accept the *Chenery* balancing test as the appropriate inquiry,[18] we need not go quite as far as the *Retail Union* court to decide this case. It may be that an agency's decision concerning retroactivity is entitled to some deference: after all, in *Chenery* itself the Supreme Court said that

held the application of the rule in the *Wyman-Gordon* adjudication itself. *See* 2 K. Davis, Administrative Law § 7:25, at 123 (1979). Second, neither the plurality nor the dissenting Justices relied on the fact of retroactivity alone: they were also concerned because the NLRB had engaged in a quasi-notice and comment procedure, requesting briefs and argument from selected *amici curiae,* rather than giving all interested persons an opportunity to comment, *cf.* 5 U.S.C. § 553(b), (c), as well as a quasi-publication procedure resembling but not complying with 5 U.S.C. § 553(d). *See* 394 U.S. at 763–65, 89 S.Ct. at 1428–29 (plurality opinion); *id.* at 777, 89 S.Ct. at 1435 (Douglas, J., dissenting). In essence, the Justices were concerned that the NLRB "*purported* to make a rule," *id.* at 765, 89 S.Ct. at 1429 (plurality opinion) (emphasis added), while ignoring the APA procedures. Third, the six Justices did not discuss, and thus apparently did not consider, the applicability of any of the precedents concerning the propriety of giving case law rules prospective effect only. By contrast, the three concurring Justices did not even feel the need to cite authority for the proposition that "[t]he Board's opinion should not be regarded as any less an appropriate part of the adjudicatory process merely because . . . the Board did not feel that it should upset the [company's] justified reliance on previous [cases]" by applying the rule retroactively. *Id.* at 774, 89 S.Ct. at 1434 (Black, J., concurring in the result). Finally, while we do not believe that the six Justices considered the subject, we think that the case for preferring rulemaking to prospective adjudicatory rules was much stronger in *Wyman-Gordon* than it is in this case. On the basis of its general statutory mandate to supervise elections, 29 U.S.C. § 159(c), the NLRB had established a bright line rule requiring employers to give unions a list of employees once the Board has ordered an election. The Board had previously established a directly contrary rule on the basis of the same mandate. As five of the six Justices specifically noted, the NLRB had never used the APA rulemaking process, a process that might have alleviated the hard-

ships created when it reversed itself on bright line rules. *See* 394 U.S. at 765 n.3, 89 S.Ct. at 1429 n.3 (plurality opinion); *id.* at 779 n.2, 89 S.Ct. at 1436 n.2 (Douglas, J., dissenting). In this case, the Department has promulgated detailed rules and has merely attempted to apply them to particular facts. Thus, we do not believe that, in this case, *Wyman-Gordon* precludes a decision to apply the adjudicatory rule prospectively only.

18. When the *Chenery* Court's language is read in context, it is clear that the Court was not articulating a test to determine whether an agency's adjudicatory rule should be given prospective effect only, but rather a test to determine whether the agency should have been required to proceed by rulemaking rather than adjudication. The very argument of the private party in *Chenery* was that his conduct should not have been prohibited since the agency had not promulgated a rule on the subject. *See* 332 U.S. at 199–201, 67 S.Ct. at 1579–80. And underlying the court's entire discussion in *Chenery* was the assumption that adjudication is always retroactive. *See id.* at 202, 67 S.Ct. at 1580 ("the Commission, *unlike a court,* does have the ability to make new law prospectively through the exercise of its rule-making powers") (emphasis added); *id.* at 203, 67 S.Ct. at 1581 ("Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency."). Nevertheless, we think that the *Retail Union* court was correct in adopting the *Chenery* balancing test. *Chenery* was decided before limiting adjudicatory rules to prospective effect had become a commonplace in Supreme Court jurisprudence. *See United States v. Peltier,* 422 U.S. 531, 533–34, 95 S.Ct. 2313, 2316–17, 45 L.Ed.2d 374 (1975) (collecting cases). Since it is now "accepted" that such limitations are sometimes proper, *Linkletter v. Walker,* 381 U.S. at 628, 85 S.Ct. at 1737, we think the *Chenery* Court's balancing test is the appropriate inquiry for determining whether to impose them.

the decision to make new law by adjudication "is one that lies primarily in the informed discretion of the administrative agency," and the Court clearly made this remark in light of the general rule that adjudication operates retroactively.[19] We need not resolve the question of the precise standard of review, however, because we believe that the Department abused its discretion by applying the *Pack* rule to this case.

In general, the ill effect of retroactivity is the frustration of the expectations of those who have justifiably relied on a prior rule; the ill effect of prospectivity is the partial frustration of the statutory purpose which the agency has perceived to be advanced by the new rule. *See Retail Union*, 466 F.2d at 390;[20] *cf. Linkletter v. Walker*, 381 U.S. at 636, 85 S.Ct. at 1741 (weighing reliance placed by law enforcement officials on prior rule against extent to which retroactive application of new rule would advance its purpose in the administration of justice). In this case, we believe that the harm to plaintiffs' justifiable reliance interests is substantial and that it is unfairly and unnecessarily inflicted. Meanwhile, we can see absolutely no harm to the statutory

design from limiting the *Pack* rule to prospective application; in fact, we think that retroactive application would be contrary to the statutory purpose.

We first examine the reasonableness of plaintiffs' reliance on the practice established by the BLM. The regulation did not clearly require plaintiffs to file accompanying statements; the phrase "signed by" an agent is at best ambiguous on the question whether an offer bearing the offeror's facsimile signature but not the agent's signature is required to comply. The only administrative interpretations of this language when McDonald and Walsh filed their offer strongly indicated that such an offer was not within the meaning of the regulation: in *Shaffer* the Secretary said the regulation applied only when the agent signed "expressly" as agent, and in *Arata* the IBLA held that an offer with a facsimile signature was signed by the offeror if the offeror intended it to be his signature.[21] On the basis of these precedents, one branch of the agency itself—the branch immediately responsible for filing matters— had concluded that accompanying statements were not necessary and followed that

---

**19.** *See* note 18 *supra.*

**20.** In *Retail Union,* the court listed five "considerations" to aid in comparing the private party's reliance interest to the agency's interest in retroactive application:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

466 F.2d at 390.

**21.** Intervenor insists that there were in fact other administrative decisions that supported the *Pack* rule. None of the decisions he cites, however, deals with the meaning and scope of the words "signed by" in the post-1964 regulation. *Union Oil Co. of Cal.*, 71 Interior Dec. 287 (1964), involved the pre-1964 regulation; prior to 1964, there was never any question that accompanying statements were required. In

*Southern Union Prod. Co.*, 22 I.B.L.A. 379 (1975), the IBLA did not indicate how the offer was signed; the question whether the offer was "signed by" the agent was simply not in issue. In *Robert C. Leary*, 27 I.B.L.A. 296 (1976), a decision handed down shortly after McDonald and Walsh filed their offer, the IBLA did articulate its distinction between an agent and an amanuensis. In that decision, however, the IBLA did not say that an agent could not also be an amanuensis for the purpose of signing the offer. Instead, the IBLA merely laid down a test which was fully consistent with Stewart's practice. The IBLA held that the offeror had to "request" the stamping of the signature and had to "formulate" the offer himself. *Id.* at 301. By "formulate," the IBLA said, it meant only that "the offeror knew that he was applying for an oil and gas lease for the lands described in the offer and that the description was inserted therein before the signature was made." *Id.* n.3. Under the *Leary* test, there is no reason why an "agent," such as Stewart, could not act as McDonald and Walsh's "amanuensis" after apprising them of the contents of the offer and being requested to stamp their facsimiles.

interpretation for over four years.[22] Thus, while the IBLA's decision in *Pack* did not technically overrule any "official decision," [23] it was unquestionably "an abrupt departure from [a] well established practice" of the agency. *Retail Union*, 466 F.2d at 390.

In these circumstances, we must conclude that plaintiffs' interpretation of the regulation was a reasonable one indeed. The extreme prejudice to plaintiffs and others who relied on the BLM's practice—the denial of an entitlement expressly created by statute, *see* 30 U.S.C. § 226(c)—must be justified by at least some statutory or regulatory interest in retroactive application.

In this case we can find no such justification. The statute itself certainly does not require the definition of a "qualified" applicant adopted by the agency in this case. And while the regulation was adopted to further the general statutory purpose of equal access to leases through full disclosure of interests, there is no serious contention that this purpose will be furthered by applying the *Pack* rule retroactively to this case. Plaintiffs have complied with the spirit of the regulations by fully disclosing all interests in the lease; they also believed in good faith that they were complying with its letter as that letter had been

**22.** At oral argument, the government denied that this was the BLM's interpretation, and intervenor Thames has vigorously joined in this denial. We admit to our own concern that there is little evidence in the record of exactly what the BLM's interpretation was. Nevertheless, what evidence there is forces us to conclude that the BLM required only the offeror's statement that he intended the facsimile to be his signature. First, there is evidence in the record that Stewart had been affixing its customers' facsimile signatures since the IBLA's decision in *Arata*. During this period, Stewart's customers were awarded over 400 leases. *See Runnells v. Andrus*, 484 F.Supp. 1234, 1239 (D.Utah 1980). There is absolutely no evidence that the BLM had ever raised any question concerning the propriety of Stewart's procedure. Second, the Secretary conceded, in the reargument of the *Pack* case, that Stewart "was clearly going on the existing precedent" of the BLM. *See also Pack II*, 85 Interior Dec. at 425 & n.1, 38 I.B.L.A. at 58 & n.1 (Frishberg, Ch. A.L.J., dissenting in part).

Intervenor's only evidence of a contrary practice is the form of inquiry which the BLM sent to plaintiff McDonald in this case. We agree that the form itself indicates that the BLM's interpretation of the regulation in March 1977 was the same as the IBLA's later interpretation in *Pack*: the BLM's inquiry was not limited solely to intent, but to whether the affixing of the facsimile was done by an agent or a mere amanuensis. In their response to the BLM's inquiry, however, neither McDonald nor Walsh followed the form; they submitted separate statements describing Stewart's procedure. Yet, the BLM upheld their offer against Thames' protest. Moreover, there is no evidence indicating how long this particular form was used by the BLM (it bears a printed date of March 1977), or whether it was used by some or all state offices. Since there is evidence in the record that the state offices were themselves changing their policy in the period pre-

ceding the *Pack* decision, this March 1977 form may have been as much a departure from established practice as the *Pack* decision itself. On the record before us, therefore, we must conclude that plaintiffs are correct in their characterization of the BLM's practice.

**23.** We reject the argument that an adjudicatory body must technically "overrule" its own prior decision before a limitation of prospectivity may be imposed. Such limitations have been imposed when individuals have relied on lower court decisions, *see United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975) ("unless we are to hold that parties may not reasonably rely upon any legal pronouncement emanating from sources other than this Court, we cannot regard as blameworthy those parties who conform their conduct to the prevailing statutory or constitutional [*i. e.*, lower-court case law] norm"), and when they have relied on an unconstitutional statute, *see Kirchberg v. Feenstra*, 609 F.2d 727, 735–36 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981). The question in a case involving an administrative agency is simply the reasonableness of the private party's reliance on the particular legal pronouncement, with the level of authority from which the pronouncement emanated a factor in answering the question. In this case, it is absurd to argue that the BLM's interpretations of the filing regulations were in no way "authoritative." Persons attempting to file lease offers had to deal with the BLM on a day-to-day basis and thus had little choice but to accept most BLM interpretations of the filing regulations. Moreover, the BLM had "original jurisdiction" over filing disputes and, indeed, over this very case. It is difficult to accept the proposition that a body with such responsibilities is incapable of making "authoritative" decisions.

spelled out in previous decisions and in the practice of the BLM.[24]

Rather than advancement of the statutory purpose through retroactive application of *Pack*, we can see only its frustration. More than 400 individuals using Stewart's filing service alone have been awarded leases on offers rendered "unqualified" by the *Pack* decision. Since leases are often open to challenge long after they have been issued,[25] the effect of retroactivity is to cloud title to hundreds of issued leases. This "emerging specter of chaotic, piecemeal title challenge[s]," *Oil Shale Corp. v. Morton*, 370 F.Supp. 108, 127 (D.Colo.1973), threatens a disruption of the entire statutory leasing program for the sake of a new interpretation of an ambiguous and inconsistently implemented regulation.

Finding the prospectivity side of the scale full·and the retroactivity side empty, we conclude that the agency abused its discretion by applying *Pack* to the McDonald and Walsh offer, which was filed before the date of the IBLA's decision in *Pack I.*[26]

The judgment of the district court is REVERSED. The case is REMANDED to that court for entry of judgment in accord with this opinion.

---

**24.** Intervenor Thames argues that the statutory purpose will be defeated because he, as the first "qualified" applicant under the corrected interpretation of the regulation, is "entitled" to the ·lease under 30 U.S.C. § 226(c). We do not wish to treat lightly the interests of the party with second priority; indeed, if we could accept Thames' argument that McDonald and Walsh are not "qualified" within the meaning of the statute, we would uphold the IBLA's decision. Thames' argument, however, begs the question whether McDonald and Walsh's offer was "qualified." As we have said, the statute does not compel the conclusion that McDonald and Walsh's offer was not "qualified"; and under the regulation, as implemented by the agency, similar offers have formerly been "qualified," more recently "unqualified," and most recently "qualified" once again. Under the circumstances, we cannot agree with Thames that any statutory purpose requires his definition of the term "qualified." Moreover, Thames can claim no prejudice in this case. His offer was not drawn first. Unlike McDonald and Walsh, he can claim no detrimental reliance on any particular agency interpretation of the term "qualified"; instead, he claims a right to take advantage of the confusion created by the BLM's interpretation. We have no intention of creating any such right.

**25.** While leases are usually not open to attack after they have issued without protest, applicants with second and third priority retain their right to protest if the BLM fails to "officially notify" them that their offers have been rejected. Apparently, the BLM often fails to send out official notifications. *See, e. g., Geosearch, Inc.*, 41 I.B.L.A. 291, 293 (1979); *Geosearch, Inc.*, 40 I.B.L.A. 397, 398 (1979).

**26.** The question whether *Pack* should apply to an offer filed between the dates of decision of *Pack I* and *Pack II* is not before us. Nor do we decide the question whether *Pack* should have been applied· to the *Pack* case itself. On the former question, we note that our assessment of the reasonableness of an offeror's reliance on *Shaffer, Arata*, and BLM practice might be somewhat different if the offer were filed subsequent to *Pack I*; on the other hand, there may be merit in using the date of final decision as the date from which a new rule will be applied. *See Runnells v. Andrus*, 484 F.Supp. at 1240. Resolution of this question might depend in part on examination of the legal status and "finality" of *Pack I* while the case was under reconsideration.

The question of applying *Pack* to *Pack* itself has been answered by the court in *Runnells*. Without attempting to express any opinion on the propriety of the *Runnells* court's conclusion, we do note one additional consideration that might enter the analysis on the issue of retroactivity in a case like *Pack*: the fairness of denying the benefit of a new rule to the litigant who establishes the new rule. *See generally Stovall v. Denno*, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).