**REVISED, May 13, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-20329

_____

MICROCOMPUTER TECHNOLOGY INSTITUTE,

                              Plaintiff-
                              Counter Defendant-
                              Appellee,

                    VERSUS

              RICHARD W. RILEY,
          Secretary of Education,
                    and
      UNITED STATES DEPARTMENT OF EDUCATION,

                              Defendants-
                              Counter Claimants-
                              Appellants.


_____

        Appeal from the United States District Court
            for the Southern District of Texas
        _____
                April 27, 1998


Before JONES and SMITH, Circuit Judges, and FITZWATER,[*] District
Judge.

JERRY E. SMITH, Circuit Judge:



                              I.

    Microcomputer Technology Institute ("MTI") is an accredited
for-profit vocational-technical school.  In the late 1980's, MTI
entered into an agreement with certain privately operated prison

_____
    [*] District Judge of the Northern District of Texas, sitting by designation.

facilities in Texas to provide training programs for inmates. Under the agreement, and under the terms of its exemption from certain state licensing requirements, MTI was obligated to provide its programs to inmates regardless of their willingness or ability to pay or to obtain financial aid. It was understood, however, that MTI would receive compensation by having the inmates obtain federal Pell Grants in order to pay for their classes, even though the inmates were not obligated to provide funding.

The Higher Education Act, 20 U.S.C. §§ 1000 *et seq.*, places significant responsibility for the administration of student aid on individual institutions of higher learning. Under the Pell Grant program, 20 U.S.C. §§ 1070 *et seq.*, a student sends an application to the Department of Education ("Department"), which determines his eligibility to receive a grant. This information is then sent to the student's schoolSSwhose participation must be approved in a separate processSSand the school determines the exact amount of the award he may receive, based on the tuition and fees "normally charged" students at that school. *See* 20 U.S.C. § 1070a-6(5)(A). The school then gives the grant money to the student either by paying it out directly, orSSas was the case hereSSby directly crediting the money to the student's tuition account.

As a participant in this process, MTI based the amount of the Pell Grants it awarded to its prisoner students on the amounts normally charged its non-prisoner students. Because the prison programs were shorter than regular classes, however, MTI "charged" somewhat less. In the award years 1989-90 and 1990-91, MTI based

2

its Pell Grant awards on a cost of attendance of $4,000: $2,300 tuition and fees and $1,700 for books, living expenses, and miscellaneous costs. In the award years 1991-92 and 1992-93, MTI raised its cost of attendance to $4,200: $2,400 tuition and fees and $1,800 expenses.

Using these figures, MTI awarded Pell Grants of $2,300 to its inmate students for the 1989-90 and 1990-91 award years, and Pell Grants of $2,400 for the 1991-92 and 1992-93 award years.[2] The total Pell Grants distributed by MTI to its inmate students during this period amounted to about $8.1 million. MTI disbursed this entire amount to its students by crediting their tuition accounts at MTI, so that MTI itself received all of those funds.

In 1992, the Department's Office of Inspector General conducted an audit of MTI's inmate education programs and determined that because the students were under no obligation to pay tuition, there was no tuition "charge" that could be offset by a Pell Grant. The Inspector General also found that because the State of Texas generously paid for its prisoners' living arrangements, and because the inmates did not pay for books or other expenses, MTI could not include the amounts for the prisoners' "expenses" in the Pell Grant awards.

Thus, the Inspector General determined that none of the inmate students had ever qualified for Pell Grants, and that MTI should be

---

[2] Pursuant to the statutory scheme, MTI calculated the Pell Grants by awarding sixty percent of the students' cost of attendance, subject to an outside limit of $2,300 through 1991 and $2,400 through 1993. Because 60% of the cost of attendance in each case slightly exceeded the maximum Grant, MTI consistently awarded the maximum.

required to reimburse the Department a total of $8,139,146. The 1992 audit report led to a 1994 final audit determination by the Department's Student Financial Assistance Program division that MTI had over-awarded and must reimburse the $8.1 million.

MTI took its case before an Administrative Law Judge ("ALJ"), who affirmed the audit determination. The ALJ's decision was subsequently affirmed by the Secretary as the final decision of the Department. MTI then filed this suit, seeking a declaratory judgment that it had properly made the Pell Grants and an injunction against the Department's recovery of the $8,139,146. The district court rejected the Department's determination.

## II.

During the relevant time periods, the Higher Education Act provided that Pell Grants "shall not exceed 60 percent of the cost of attendance . . . at the institution at which the student is in attendance." 20 U.S.C. § 1080a(b)(3). The statute further defined "cost of attendance" as "the tuition and uniform compulsory fees normally charged a full-time student at the institution," 20 U.S.C. § 1070a-6(5)(A), plus an allowance for "expenses incurred by the student which shall not exceed $1,700[3] for a student without dependents living at home with parents," id. § 1070a-6(5)(B)(i). The Department disallowed MTI's calculations both of tuition "normally charged" and of the inmates' expense allowance.

---

[3] This amount was raised to $1,800 in 1991.

A.

Because we deal here with an agency's interpretation of the statute it is charged with administering, we must apply the two-step analysis described in *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). If the language of the statute plainly resolves the point, we of course must enforce it. *See Louisiana Dep't of Labor v. Department of Labor*, 108 F.3d 614, 618 (5th Cir.) (citing *Chevron*, 467 U.S. at 842-44), *cert. denied*, 118 S. Ct. 80 (1997). But if the statute is ambiguous, we must defer to "reasonable interpretations" made by the agency charged with administering it. *Id.*

It matters not that the Department's interpretations were adjudicative decisions, rather than purely prospective rulemaking. "Congress has long been aware of the common practice of both courts and agencies to make binding policy through case-by-case adjudications." 1 K. DAVIS & R. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 3.5, at 120 (1994). An agency's interpretation need not occur in the context of formal rulemaking, so long as it is the considered and final policy decision of the agency.[4]

Even the adjudicative interpretations of policy-making agencies are entitled to *Chevron* deference. *Cf., e.g., NationsBank, N.A. v. Variable Annuity Life Ins.* Co., 513 U.S. 251, 254-57 (1995) (deference accorded to Comptroller's letter ruling);

---

[4] *But see, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) (no deference given to agency litigation positions).

5

*see also* DAVIS & PIERCE, *supra*, at 120.  Unless the Department's interpretation of the statute is contrary to its plain language or is simply unreasonable, we defer to it.

## B.

It is not difficult to see the merit in the Department's interpretation of the expense allowance provision.  The statute provides for "an allowance for room and board costs, books, supplies, transportation, and miscellaneous expenses *incurred by the student* which shall not exceed" a set maximum.  20 U.S.C. § 1070a-6(5)(B)(i) (emphasis added).  The parties here spend some time arguing what maximum should apply.  But by doing so, they miss the plain meaning of the provision:  The expense allowance is not a gift from the federal government, but is to coverSSsubject to a maximum amountSSexpenses incurred by the students.

Here, no one has challenged the Inspector General's determination that the prisoners incurred no expenses whatsoever, save the minimal amount they spent in the prison commissary.  The prisoners were provided with free lodging and clothing, three square meals every day, and free transportation to and from classes.  Further, the inmate students were not required to purchase, or in any way pay for, the use of their books and other educational materials.

In effect, MTI argues that the expense allowance need bear no relation to expenses incurred by the prisoners, but rather that students may automatically receive the maximum allowance provided

in the statute. This logic would require us also to uphold for the prisoners, under subsection (iv), "an allowance for child care which shall not exceed $1,000." 20 U.S.C. § 1070a-6(5)(B)(iv). This would be absurd, just as would the allowance for living expenses awarded to those who are literally incapable of incurring any such expenses. "No expenses" should result in "no allowance." Therefore, not only was the Department's interpretation "reasonable," it was necessary: Any interpretation of the statute to allow for unincurred expenses would be contrary to its plain meaning.

## C.

Slightly more difficult is the interpretation of the tuition and fees "cost" for the prisoners. The HEA defines the tuition and fees component of a student's "cost of attendance" not as the actual amount charged a student. Rather, it pegs a student's tuition and fees to those "normally charged" at the institution. 20 U.S.C. § 1070a-6(5)(A). This allows schools to give tuition waivers and scholarships to individual students without reducing the amount of the Pell Grant to which the student may be entitled.

The Department interprets this phrase to mean tuition "normally charged of similarly-situated students." Thus, a state university could not claim that in-state students were "normally charged" the higher out-of-state rates. Even though a large body of the student population did in fact pay the higher rates, the relevant "normally charged" population for in-state students would

7

be other in-state students.

MTI challenges this interpretation. It claims that the statute does not permit the subclassification of students for the purpose of determining what they are "normally charged." It also asserts, in effect, that even if subclassification could be permitted, the distinction drawn here is impermissible.

## 1.

We have no problem upholding the agency's subclassification of students to determine what is "normally charged" of a discrete population. Courts have recognized that in some instances, an agency requirement limiting the availability of a statutory benefit beyond the requirements of the statute may be inherently unreasonable. *See, e.g., Snowa v. Commissioner*, 123 F.3d 190 (4th Cir. 1997). We are not presented with such a case, however, for it is eminently reasonableSSand squarely in accord with the statutory mandateSSthat dissimilar students should be treated as such. In-state students are not "normally charged" out-of-state rates, and history majors may not be "normally charged" the same as nursing students. The statute plainly allows distinctions to be drawn among groups of students who are normally charged different amounts. Subclassification, *per se*, is appropriate.

## 2.

The problem with this approach is defining the relevant student population. The inherent problems in imposing any

8

meaningful standards by which to classify the students, asserts MTI, dictate a single, "plain vanilla" standard. For example, MTI argues, if some students are given tuition waivers and some are not, the Department might divide the relevant populations as those who are charged full price, versus those who are given tuition waivers. This, of course, could lead to a morass of individualized tuition charge determinations, in direct contravention of the statute, which bases Pell Grants not on actual charges but on normal ones.

The Department rejoins that such is not the circumstance here. The inmates were under no legal obligation to pay tuition. Neither party disputes that tuition waivers were not a matter of discretion, but were mandated by state regulation and by MTI's contractual arrangements with the prisons. This, argues the Department, makes them more like in-state students and less like gratuitous recipients of financial aid.

The argument, then, comes down to the reasonableness of the agency's determination that for prison inmates, to whom MTI was required to provide classes free of charge, the tuition "normally charged" was zero. We cannot say that either interpretation would have been unreasonable. As both sides' counsel demonstrate, good arguments can be made for either approach. We must therefore defer to the agency's reasonable interpretation of its own statute.

Where, as here, Congress has left open a question arising from a statute, some institution must resolve it. And where Congress has charged an agency with administering the statute, courts must

9

not substitute their judgment for the delegated policymaking role of the agency.

> Judges . . . are not part of either political branch of government. . . . In contrast, an agency to which Congress has delegated policymaking responsibility may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of government to make policy choices.

*Chevron*, 467 U.S. at 865-66. We therefore defer to the Department's interpretation of the statute.


## III.

MTI asserts that even if we uphold the Department's interpretation of the Higher Education Act, this interpretation should not be applied retroactively to disgorge the $8.1 million that MTI had previously collected. MTI also objects that the government should be equitably estopped from enforcing this policy against MTI.


## A.

To establish that the instant determination reverses previous policy, MTI relies on a memorandum from the Department's Office of the General Counsel dated February 1982, addressing the situation of a Virginia for-profit school that, like MTI, offered vocational programs to prisoners. Eighty percent of the school's students were inmates. Like MTI, the Virginia school distributed Pell Grants to its inmate students based on the tuition charged the

10

twenty percent of its students who were not prisoners.  In the case of the prisoners, the school routinely waived the difference between its normal tuition and the amount awarded in the Pell Grant.

The memorandum states that the Department had "consistently defined tuition and fee waivers as student financial aid," so that the availability of these waivers does not affect the "cost of attendance" for Pell Grant purposes.  There is no hint in that memorandum that the Department would treat inmate students as a discrete group for purposes of determining tuition charges.  Further, that the prisoners in fact paid nothing made no difference to the determination of their "cost of attendance."  This was said to be the "long standing policy of the Department," and the memo opined that "changes would, in our view, require regulations."

The Department now attempts to distinguish the policy articulated in that memorandum, baldly guessing that the Virginia school "presumably" granted such waivers as a matter of discretion, while MTI was compelled to waive tuition charges.  But there is no evidence as to whether the Virginia school could have collected tuition dollars from inmates.  Furthermore, even were the distinction to exist, nothing in the memorandum foreshadows the Department's recent determination that where waivers are granted not as a matter of discretion, the cost of attendance will be zero.  From this memorandumSSand there is nothing to contradict itSSit appears that the Department's determination is a departure from its former policies.

11

B.

When an agency changes its policy prospectively, a reviewing court need only determine the reasonableness of the new interpretation in terms of *Chevron*. But where an agency makes a change with retroactive effect, the reviewing court must also determine whether application of the new policy to a party who relied on the old is so unfair as to be arbitrary and capricious. *See* DAVIS & PIERCE, *supra*, at 241-42; *see also Public Serv. Co. v. FERC*, 91 F.3d 1478, 1488 (D.C. Cir. 1996), *cert. denied*, 117 S. Ct. 1723 (1997).

In *S.E.C. v. Chenery Corp.*, 332 U.S. 194 (1947), still the leading case on administrative retroactivity, the Court recognized that "problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule." *Id*. at 202. The Court held:

> [W]e refuse to say that the [S.E.C.], which has not previously been confronted with the problem of management trading during reorganization, was forbidden from . . . announcing and applying a new standard of conduct. That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.

*Id*.

This principle is often applied in the circuit courts by

balancing variously articulated factors that measure unfairness to the parties against the "mischief" of allowing the previousSSnow incorrectSSinterpretation to stand. The most oft-cited approach is the five factors articulated in *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972),[5] but that formulation has not been adopted by this court.

Rather, we have recognized that the balance must be examined case-by-case, and factors such as those articulated in *Retail, Wholesale* are of little practical use. Thus, in *McDonald v. Watt*, 653 F.2d 1035 (5th Cir. Unit A Aug. 1981), we examined the extent of the agency's departure from previous interpretation and the reasonableness of the aggrieved party's reliance, on one side of the balance, and the statutory or regulatory interest in retroactivity, on the other. Finding justified and detrimental reliance, and finding no interest at all in retroactive application, we refused to impose retroactivity. *Id*. at 1045-46. The test in this circuit, then, is simply to balance the ills of retroactivity against the disadvantages of prospectivity.

## 1.

Before we attempt to evaluate the balance, we must address the

---

[5] *Cf., e.g., Lehman v. Burnley*, 866 F.2d 33, 37 (2d Cir. 1989) (employing *Retail Union* factors); *Dole v. East Penn Mfg. Co.*, 894 F.2d 640, 647 (3d Cir. 1990) (same); *NLRB v. Ensign Elec. Div. of Harvey Hubble, Inc.*, 767 F.2d 1100, 1103 n.2 (4th Cir. 1985) (same); *J.L. Foti Constr. Co. v. OSHA Review Comm'n*, 687 F.2d 853, 858 (6th Cir. 1982) (same); *NLRB v. Wayne Transp.*, 776 F.2d 745, 751 (7th Cir. 1985) (same); *Oil, Chem. & Atomic Workers Int'l Union Local 1-547 v. NLRB*, 842 F.2d 1141 (9th Cir. 1988) (same). *Cf. also, e.g., Ryan Heating Co. v. NLRB*, 942 F.2d 1287, 1288 (8th Cir. 1991) (employing different but similar formulation).

question of what deference, if any, we should accord an agency's determination that a rule should be applied retroactively. Some circuits have held that an agency's determination on retroactivity is entitled to no deference. *See, e.g., Retail Wholesale*, 466 F.2d at 390. Others defer to an administrative decision on retroactivity unless it is "manifestly unjust." *See, e.g., NLRB v. W.L. Miller Co.*, 871 F.2d 745 (8th Cir. 1989). In *McDonald*, we indicated that an agency's decision on retroactive application might be entitled to some deference, but we did not actually decide the issue. *See id.* 653 F.2d at 1043 n.18.

Such deference, like deference to any other agency policy decision, seems, at first blush, to be within *Chevron*'s concept of the administrative state: Where Congress has delegated policymaking power, expert and politically accountable agencies, rather than generalist and unaccountable judges, should fill statutory interstices. *See Chevron*, 467 U.S. at 844-45, 865-66.

Retroactivity, however, involves no policy considerations, but concerns only the application of settled policy under particular circumstances. It does not call any agency expertise into play; rather, it is a legal concept involving settled principles of law and is no more subject to deference than is an agency's interpretation of, say, a statute of limitations.

In short, the rationale of *Chevron* simply has no bearing on this inquiry. Therefore, we accord no deference to the agency's position on retroactivity.

14

2.

Accordingly, we must weigh the disadvantages of retroactivity§§frustration of parties' expectations§§against the detrimental effect of prospectivity§§partial frustration of what we have now determined is the proper statutory interpretation. As we have stated, at no time was MTI entitled to Pell Grant payments for providing training programs to inmates to whom MTI was required to provide classes free of charge, and for whom the tuition "normally charged" was zero. Thus, the United States has a considerable interest in seeing that Pell Grant awards be properly distributed, and that an errant educational institution not be allowed to keep the proceeds of its improper distributions.

On the other side of the balance is MTI's assertion of reliance on the Department's previous interpretation. We conclude, as an initial matter, that MTI's apparent belief that it could award Pell Grants based upon non-existent and unincurred "living expenses" was entirely unjustified. The statute makes plain that the expense allowance must be based on "expenses *incurred by the student.*" 20 U.S.C. § 1070a-6(5)(B)(I) (emphasis added).

This was not ambiguous, but obviously foreclosed an expense allowance of $1,700 or $1,800 for inmates who quite literally had no living expenses aside from the paltry amounts they spent at the prison commissary on toiletries and the like. MTI was never entitled to make awards based on these expense amounts and could never reasonably have believed that it was. MTI therefore must

15

surrender that portion of the erroneously collected $8.1 million.

With regard to the erroneously awarded amounts based on tuition "normally charged," however, the balance appears to tilt the other way. The 1982 memorandum explicitly states that, although eighty percent of the students at the school were prisoners, the fact that twenty percent of its students§§the non-inmates§§paid full price allowed the school to calculate tuition "normally charged" for Pell Grant purposes on the basis of the full price paid by non-inmate students. It was reasonable for MTI to rely on this statement in its Pell Grant disbursals, and on the Department's opinion that any changes in that "long standing policy" would be made only by prospective regulations.

We recognize the Department's interest in ensuring that money be distributed only to those entitled to receive it, but we find this interest outweighed by the detriment that would befall MTI if we applied this interpretation retroactively. Given the Department's previous statements, and MTI's reliance thereon, the Department cannot now require the repayment of the millions of dollars in Pell Grants that MTI disbursed to inmate students, based on the tuition it charged non-inmate students.[6]

## C.

MTI asserts that the Department should be estopped from

---

[6] This, of course, leaves the district court on remand to determine what portion of the total amount collected by MTI was attributable to the "living expenses" component of the Pell Grant§§and thus must be refunded to the government§§and what portion was attributable to the "tuition" component that cannot be disgorged retroactively.

16

requiring the return of money wrongfully distributed to MTI's inmate students, because the Department's failure to end the practice amounted to its tacit approval.  We disagree.

Equitable estoppel is almost never available against the government.  In *Premier Bank v. Mosbacher*, 959 F.2d 562, 569 n.3 (5th Cir. 1992), we stated that we had "yet to decide" whether the government could ever be estopped.  Since then, we have not found any situation in which estoppel would be warranted.  *Cf., e.g., United States v. Marine Shale Processors*, 81 F.3d 1329, 1348-50 (5th Cir. 1996) (noting separation of powers problem with judicial estoppel of coordinate branches).

Further, the Supreme Court has specifically foreclosed estoppel where such would call for the payment of funds not authorized by Congress.  *See Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990).  Here, where we have just stated that Pell Grant distributions to the inmates were not authorized under the Higher Education Act, a finding that the government is estopped from recovering the unauthorized payments would be in direct contravention of *Richmond*.

Finally, even were estoppel generally available against the United States, it likely would not be available here.  There is simply no evidence that the Department gave any indication of approval of the Pell Grant distributions MTI made to the inmates. A party cannot not be estopped by a position it never took.


IV.


17

We thus conclude that the Department's interpretation of the Higher Education Act is consistent with the plain text of the statute and is reasonable. We defer to that interpretation, and find that at no time were MTI's inmate students eligible to receive Pell Grants.

But, because MTI reasonably and detrimentally relied on the Department's previous interpretation with regard to the tuition-based portion of the awards, and because we believe that detriment outweighs the Department's interest in applying its new rule, the new interpretation may not be applied retroactively to force MTI to reimburse that portion of the awards. For the portion of the awards that is attributable to MTI's erroneous determination of expenses incurred by the students, however, MTI must reimburse the Department the entire amount.

We therefore VACATE the judgment and REMAND for proceedings consistent with this opinion.