[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-15077

_____

KARASTAN L. EDWARDS,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A095-146-708

_____

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

After considering Karastan Edwards' petition for rehearing and the government's response to it, we grant Edwards' petition, withdraw our previous opinion dated December 23, 2022, and published at 56 F.4th 951, and substitute this opinion for it. This opinion is in all material respects the same as our earlier one, except that we explain in more detail why we must apply the retroactivity rule from *Yu v. U.S. Att'y Gen.*, 568 F.3d 1328, 1330 (11th Cir. 2009). *See* Part III.A., *infra*.

Karastan Edwards petitioned for review of the Board of Immigration Appeals' dismissal of his appeal from an immigration judge's removal order. That order was based on the IJ's determination that Edwards is removable, ineligible for cancellation of removal, and ineligible for asylum because he has been convicted of an "aggravated felony" as the Immigration and Naturalization Act defines the term. The IJ also determined that Edwards is ineligible for withholding of removal and Convention Against Torture relief. Edwards challenges all those determinations.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This case traveled a long and winding path before it ended up here. That path has included multiple appeals from the IJ to the BIA, multiple appeals from the BIA to this Court, multiple remands from this Court to the BIA, and multiple remands from the BIA back to the IJ. We will summarize that procedural history and some of the factual background.

## A.  Initial Immigration Judge Removal Order

Edwards is a native and citizen of Jamaica who was admitted to the United States in 2002 and who became a lawful permanent resident in 2003.  In February 2012 he pleaded guilty to and was convicted of the Georgia crime of family violence battery in violation of O.C.G.A. § 16-5-23.1.  For that crime Edwards was sentenced to 12 months confinement, but he was allowed to serve all of it on probation.

In March 2015 the Department of Homeland Security initiated removal proceedings against Edwards on the theory that his Georgia family violence battery conviction was an "aggravated felony" under the INA, making him removable.  Edwards challenged that classification of his crime.  He also filed applications for asylum, for withholding of removal, and for CAT relief.  In those applications, he claimed membership in two social groups: "relatives of opponents of the pervasive gang and corrupt situation" in Jamaica, and "returning Jamaicans who have spent lengthy periods of time in industrialized developed affluent countries."

At a removal hearing, Edwards testified about those two asserted social groups.  He testified that his mother, who lives in Jamaica, is part of a community organization that tries to positively influence children and that she was targeted and threatened by gangs because of it.  Another reason she was targeted, according to Edwards, was because gang members believed that they could use her to get money from him.  Edwards also testified that while

visiting Jamaica in 2011 he had twice been robbed by gang members and was cut on the shoulder by a knife during one of those robberies. He claimed that he had reported that incident to the police and identified one of the perpetrators, but the police did nothing about it.

An immigration judge found that the Georgia family violence battery conviction for which Edwards had been convicted was an aggravated felony under the INA, which made him removable and statutorily ineligible for both cancellation of removal and asylum. The IJ also found that neither of the social groups Edwards claimed membership in made him eligible for withholding of removal. The claimed social group of Jamaicans returning to Jamaica was not one "perceived by Jamaican society as sharing any common characteristics," and gangs targeted those people only because they might have money. As for the social group of having family members who oppose gangs and corruption, the IJ found that Edwards had not shown that his family relationships would cause him any harm if he returned to Jamaica.

The IJ also determined that Edwards was ineligible for CAT relief because he had not shown that he more likely than not would be tortured in Jamaica. In doing so, the IJ noted evidence of the Jamaican government's "efforts to combat corruption in the police and security forces as well as abuses that may rise to the level of torture," from which the IJ inferred that the government had not participated in or acquiesced to any torture.

B. First Appeal to the BIA, First State Court Sentence Modification Order, and First Remand to the Immigration Judge

After Edwards appealed the IJ's order to the BIA, and while that appeal was still pending, he filed a motion to remand the case to the IJ. He asked for a remand because after filing the appeal he had gotten a Georgia state court judge to issue an order "modifying" his sentence for the Georgia family violence battery conviction.

Edwards' motion to the state court requesting a sentence modification had focused exclusively on the immigration consequences of his 12-month sentence. The motion informed the court that Edwards' "misdemeanor crime in Georgia has significant collateral effects on his status as a legal permanent resident of the United States" and that "due to the 12 month sentence, his misdemeanor offense is viewed as an aggravated felony by the immigration courts." That 12-month sentence, the motion told the state court, "will result in his removal from the United States and will leave his U.S. Citizen spouse and son without their primary financial and emotional support." It continued: "Further, [Edwards] shows this is harsh and would not be in the best interest of himself or society and that same would be detrimental to all." In his motion, Edwards acknowledged that he had already "completed his sentence as required by the court," but he still requested that sentence be modified "from 12 months probation to 11 months probation, a more reasonable judgment in order that

[Edwards] may continue his contribution to society and his family."

The district attorney's office for the county where Edwards had been convicted consented to Edwards' motion, and the state court granted it. The order did not give a reason for granting the motion other than stating that the "motion ha[d] been read and considered by the Court, and the State ha[d] an opportunity to be heard on the matter and ha[d] no objection to" it. The court ordered Edwards' already-served sentence to "be modified from 12 months probation to 11 months and 27 days probation." And the order stated that: "All other terms and conditions of the sentence shall remain in full force and effect as originally imposed." The state court issued that order in August 2015, about two-and-a-half years after Edwards had finished serving the 12-month sentence that had been imposed on him in February 2012.

In light of the state court's sentence modification order, the BIA granted Edwards' motion to remand to the IJ. After considering the state court order, the IJ again ordered Edwards removed. It determined that both the modification order and the original sentence were entitled to full faith and credit, but it interpreted the modification order as changing only Edwards' sentence of probation, not his sentence of confinement. Under the IJ's interpretation, Edwards' modified sentence was "12 months or one year of confinement with 11 months and 27 days of such sentence suspended in favor of probation." Based on that interpretation of the modification order, the IJ determined that Edwards' sentence,

even as revised, still amounted to a term of imprisonment of at least one year, which meant he had been convicted of an aggravated felony. That made Edwards removable, ineligible for cancellation of removal, and ineligible for asylum. The IJ also incorporated in the order the earlier decisions about Edwards being ineligible for withholding of removal and CAT relief.

C. Second Appeal to the BIA, First Appeal to this Court, Second State Court Sentence Modification Order, and Second Remand to the Immigration Judge

Edwards appealed the IJ's second order to the BIA, which affirmed it in all respects and dismissed the appeal. In doing so, the BIA found no clear error in the IJ's interpretation of the state court sentence modification order or in the determination that Edwards had been convicted of an aggravated felony despite that state court order. The BIA also affirmed the IJ's determination that Edwards was ineligible for withholding of removal. It "discern[ed] no clear error in the finding that the record does not reflect adequate evidence that the respondent would be targeted *because* he is a returnee from the United States or due to his family ties." It also noted record evidence that "the criminal gangs that the respondent fears in Jamaica target victims because they seek money, and not due to the fact they come from the United States or otherwise." Finally, the BIA "affirm[ed] as lacking clear error the [IJ's] finding that [Edwards] has not established that it is more likely than not that he would be tortured in Jamaica or that he

could not relocate within Jamaica and avoid the likelihood of such harm."

Edwards petitioned this Court for review of the BIA order. But while that petition was pending, in February 2017 he obtained another state court sentence modification order. It resulted from his second motion requesting a modification, which was similar to his first motion, borrowing much of its language. Like the first modification motion, the second one focused exclusively on the immigration consequences that Edwards was facing. It also alluded to the IJ's interpretation of the first modification order and asked the state court to "clarify that the original sentence has in fact been *modified from 12 months confinement allowed to be served on probation to 11 month[s] and 27 days confinement allowed to be served on probation.*" Edwards asked for this second modification, as he had the first one, "in order that he may continue his contribution to society and his family." In other words, so that he would not be removed from this country.

The district attorney's office, as it had with Edward's first sentence modification motion, consented to his second one, and only two days after Edwards had filed that second motion the state court granted it. As with the first modification order, the state court gave no reason for this second one other than noting that Edwards "has filed a new motion to modify and clarify; and said motion having been considered by the Court and the State having no objection, the Court grants the motion." This time the state court modified Edwards' already-served sentence "to 11

months and 27 days confinement allowed to be served on proba-
tion." Exactly what Edwards had requested. The state court is-
sued the second modification order in February 2017, about four
years after Edwards had finished serving the 12-month sentence
that had been imposed on him in February 2012.

On the same day the state court issued the second modifi-
cation order, Edwards filed with the BIA a motion to reopen, and
in May 2017 the BIA granted it. We dismissed the petition that
had been pending with us. The BIA remanded the case to the IJ,
who again — for the third time — ordered Edwards removed.
The IJ determined that the second state court sentence modifica-
tion order did not change Edwards' conviction from being for an
aggravated felony under federal immigration law. Summarizing
BIA precedent, the IJ concluded that the original sentence im-
posed on Edwards controlled because the new modification order
did not void it. Once again, the IJ incorporated by reference his
earlier decisions that Edwards is ineligible for withholding of re-
moval and CAT relief, finding that no new evidence had changed
those decisions.

D.  Third Appeal to the BIA and Second Appeal to this Court

Edwards again appealed to the BIA, which affirmed the IJ
in all respects and dismissed the appeal. In doing so, the BIA
treated the second state court modification order as an order clari-
fying Edwards' sentence and found that under this Court's prece-
dent the "clarification" had no legal effect for immigration pur-
poses. That meant Edwards had still been convicted of an aggra-

vated felony, and as a result he was still ineligible for cancellation of removal or asylum. As for withholding of removal and CAT relief, the BIA reiterated the same reasons it had previously given for affirming the IJ's determination that Edwards was ineligible for both.

Edwards petitioned this Court for review. But while that petition was pending the government filed an unopposed motion to remand to the BIA for it to reconsider the state court's second modification order. The reason the government gave for the request was that the BIA may have treated the "modification" order as a "clarification" order, which might have been contrary to BIA precedent as it stood at the time. We granted the motion.

E. <u>Intervening Agency Authority:</u>  *Matter of Thomas and Thompson*

Before the BIA decided Edwards' case on remand, the Attorney General issued a controlling decision, *Matter of Thomas*, 27 I. & N. Dec. 674 (A.G. 2019). Up until then, to determine the immigration effect of state court orders the BIA applied different tests depending on the type of order at issue. If the order "vacated" a conviction based on a defect in the proceedings, the BIA treated that action as having legal effect for immigration purposes. *Id.* at 675. If the order "modified" a sentence, it was given full faith and credit regardless of the reason for the modification, meaning the sentence had legal effect for immigration purposes. *Id.* And if the order "clarified" the sentence, the BIA used a multi-factor test to determine if it had any immigration effect. *Id.* The

different treatment given to "clarification" and "modification" orders had led in two BIA cases to the two petitioners, whose situations were materially identical, getting opposite outcomes based on nothing more than the labels that the state courts had given the order altering each petitioner's sentence. *See id.* at 679.

The Attorney General certified to himself those two BIA decisions "to address these inconsistencies and to clarify the appropriate treatment under the INA." *Id.* The "appropriate treatment under the INA," according to the Attorney General, was that the BIA precedent about the distinction between "clarification" and "modification" orders needed to be overruled. *See id.* at 674–75, 690. The Attorney General interpreted the relevant statutory text as meaning that Congress' intent was that all:

> state-court orders that modify, clarify, or otherwise alter a criminal alien's sentence . . . will be given effect for immigration purposes only if based on a procedural or substantive defect in the underlying criminal proceeding; these orders will have no effect for immigration purposes if based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or the avoidance of immigration consequences.

*Id.* at 674, 690. So the labels a court put on the order describing the action the court was taking would no longer determine the immigration effect of the order. All that would matter is wheth-

er the order was issued based on a procedural or substantive defect in the underlying criminal proceeding.

### F. Final BIA Decision

After *Matter of Thomas* overruled the "clarification" and "modification" regime, the BIA was left with the task of applying to this case the new regime focused on procedural or substantive defects. Doing that, the BIA noted that Edwards "has pointed to no evidence in the record to reflect that his criminal proceedings were marred by procedural or substantive defect." As a result, under *Matter of Thomas* the modification order had no effect for immigration purposes; it did not change the fact that Edwards had been convicted of an aggravated felony under the INA.

The BIA also adopted, yet again, its past reasoning that Edwards was ineligible for withholding of removal and CAT relief. It reiterated, among other things, that Edwards had not proved that he would be harmed because of membership in his claimed social groups and that the IJ "did not clearly err in finding inadequate evidence to support a finding that it was more likely than not that [Edwards] would be tortured in Jamaica." The BIA dismissed Edwards' appeal.

In his petition to us, Edwards challenges the BIA's determination that he was convicted of an aggravated felony. His challenge attacks the validity of the Attorney General's *Matter of Thomas* decision, including the reasonableness of its statutory in-

terpretation.  Edwards also contends that the BIA erred in finding him ineligible for withholding of removal and CAT relief.[1]

## II.  STANDARDS OF REVIEW

"When the BIA issues its own opinion, we review only the decision of the BIA, except to the extent the BIA expressly adopts the IJ's decision."  *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1230–31 (11th Cir. 2007) (quotation marks and ellipsis omitted). "We review questions of law *de novo,* including whether a conviction qualifies as an aggravated felony under the Immigration and Nationality Act."  *Talamantes-Enriquez v. U.S. Att'y Gen.*, 12 F.4th 1340, 1347 (11th Cir. 2021) (quotation marks omitted).  We also review *de novo* questions of statutory interpretation, but we do so through the lens of *Chevron*, which dictates that the Attorney General and the BIA are "entitled to deference in interpreting ambiguous provisions of the INA."  *Negusie v. Holder*, 555 U.S. 511, 516 (2009) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–843 (1984)); *see also I.N.S. v. Aguirre-Aguirre*, 526

---

[1]    In addition, Edwards contends that the IJ should have recused himself and that the BIA erred in determining that the IJ did not need to recuse. We have reviewed this contention and determined that it is entirely without merit and warrants no further discussion.  *Cf., e.g.*, *United States v. Iriele*, 977 F.3d 1155, 1165 n.6 (11th Cir. 2020) ("We will not discuss why those scattershot contentions lack merit."); *Tompkins v. Moore*, 193 F.3d 1327, 1331 n.1 (11th Cir. 1999) ("The issues we do not write more about merit no further discussion here beyond the statement that we agree with the district court . . . ."); *Dominguez v. Tom James Co.*, 113 F.3d 1188, 1190 (11th Cir. 1997) ("None of the Company's other issues that we have listed above merit any further discussion.").

U.S. 415, 425 (1999) (recognizing that "judicial deference to the Executive Branch is especially appropriate in the immigration context"); *Herrera v. U.S. Att'y Gen.*, 811 F.3d 1298, 1300 (11th Cir. 2016). "Congress has charged the Attorney General with administering the INA, and a 'ruling by the Attorney General with respect to all questions of law shall be controlling.'" *Negusie*, 555 U.S. at 516–17 (quoting 8 U.S.C. § 1103(a)(1)). In light of that and other considerations, the Supreme Court has held not only that *Chevron* deference applies, but also that "[j]udicial deference in the immigration context is of special importance." *Id.*

Under *Chevron*, if the statutory text is unambiguous and answers the question presented, we apply the text according to its terms with no need for deference. *See Hincapie-Zapata v. U.S. Att'y Gen.*, 977 F.3d 1197, 1200 (11th Cir. 2020); *Arevalo v. U.S. Att'y Gen.*, 872 F.3d 1184, 1188 (11th Cir. 2017). But "if the statute is silent or ambiguous with respect to the specific issue presented, we must then determine whether the agency's interpretation is reasonable or based on a permissible construction of the statute." *Arevalo*, 872 F.3d at 1188 (citing *Chevron*, 467 U.S. at 843); *see also Amezcua-Preciado v. U.S. Att'y Gen.*, 943 F.3d 1337, 1341 (11th Cir. 2019).

We review the BIA's factual findings under the "highly deferential" substantial evidence standard, under which we may reverse only if the "record not only supports reversal, but compels it." *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009) (quotation marks omitted).

### III.  AGGRAVATED FELONY ISSUE

Edwards challenges the BIA's determination that he was convicted of an aggravated felony.  If he was, he is statutorily ineligible for cancellation of removal and asylum.  *See* 8 U.S.C. § 1158(b)(2)(B)(i); *Talamantes-Enriquez*, 12 F.4th at 1347.  An "aggravated felony" is a "crime of violence . . . for which the term of imprisonment [was] at least one year."  8 U.S.C. § 1101(a)(43)(F).  The meaning of "term of imprisonment" and the other definitional components of an "aggravated felony" are matters of federal law.  *See Talamantes-Enriquez*, 12 F.4th at 1354 ("[W]e are not bound by a state judge's interpretation of a state court sentence order because we are dealing with federal law and federal statutes, not state law and state statutes."); *Herrera*, 811 F.3d at 1301 ("Because words in federal statutes reflect federal understandings, the statement of the Georgia court in its order of clarification that [the petitioner] was not sentenced to any confinement was due no weight in his immigration proceeding.") (quotation marks and citation omitted; alteration adopted); *United States v. Ayala-Gomez*, 255 F.3d 1314, 1319 (11th Cir. 2001) ("Words in federal statutes reflect federal understandings, absent an explicit statement to the contrary, even if a state uses the word differently.").

Edwards does not dispute that his Georgia family violence battery conviction was for a crime of violence; what he challenges is the BIA's determination that his term of imprisonment was for at least one year.  *Cf. United States v. Garza-Mendez*, 735 F.3d 1284, 1287 (11th Cir. 2013) ("On appeal, [the defendant] does not contend that his state conviction [of Georgia family violence battery]

is not a crime of violence under 18 U.S.C. § 16; instead he argues that he was not sentenced to an imprisonment term of at least one year.") (quotation marks omitted; alteration adopted). Edwards makes that challenge despite the fact that under our precedent his original sentence of 12 months confinement allowed to be served on probation is undoubtedly a term of imprisonment of at least one year. *See Talamantes-Enriquez*, 12 F.4th at 1353 ("Our precedent establishes that [the petitioner] was sentenced to a term of imprisonment for at least one year for purposes of § 1101(a)(43)(F), even if he was permitted to serve part or all of that sentence on probation.").

Edwards' position is that what counts for immigration purposes is not his original sentence of 12 months but the modified sentence of 11 months and 27 days that resulted from the last state court order. Because that contention is directly foreclosed by the Attorney General's *Matter of Thomas* decision, Edwards attacks that decision's legality. He makes two broad contentions about it: that the Attorney General lacked the authority to issue *Matter of Thomas* at all; and that even if he had the authority, *Matter of Thomas* is an unreasonable interpretation of the INA.

## A. The Attorney General's Authority

Congress has provided that on matters of immigration law "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). As we have recognized: "Congress has vested in the Attorney General the authority to decide legal questions arising under the

immigration laws." *Farquharson v. U.S. Att'y Gen.*, 246 F.3d 1317, 1323 n.7 (11th Cir. 2001). "The Attorney General has delegated this function to the Board," but he still "retains the authority to review final decisions of the BIA" and overrule them, as he did here. *Id.*; *see also* 8 C.F.R. § 1003.1(h); *Yu*, 568 F.3d at 1333 ("The fact that the BIA had previously construed the statute differently . . . did not prohibit the Attorney General from holding otherwise."). Not only that, but the Attorney General can review and overrule BIA decisions upon his own initiative, *see Farquharson*, 246 F.3d at 1323 n.7; 8 C.F.R. § 1003.1(h)(1)(i), as he did here.

Edwards takes issue with the Attorney General's decision to use adjudication instead of rulemaking in this instance. But it "is well established . . . that agencies have discretion to choose whether to proceed by rulemaking or adjudication." *RTC Transp., Inc. v. I.C.C.*, 731 F.2d 1502, 1505 (11th Cir. 1984). That "is true even when adjudication is used to announce new policy after years of contrary precedent." *Id.* The Attorney General's choice to overrule BIA precedent through the decision in *Matter of Thomas* instead of through rulemaking was well within his statutory authority.

Edwards alternatively argues that the *Matter of Thomas* decision cannot be applied retroactively to him. But we have already rejected this kind of retroactivity argument. We addressed it in a case where the BIA had dismissed a petitioner's appeal based on "the Attorney General's intervening precedential decision" that had overruled BIA precedent. *Yu*, 568 F.3d at 1330. We held that

the "BIA did not retroactively apply a new law but instead applied the Attorney General's determination of what the law had *always* meant." *Id*. at 1333 (quotation marks omitted).

Edwards contends that, despite our precedent in *Yu*, we should conduct a balancing test based on *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), to determine whether *Matter of Thomas* should be retroactively applied to him. Our predecessor Court did apply the *Chenery* balancing test, but it was in a case reviewing a different agency's decision. *See McDonald v. Watt*, 653 F.2d 1035 (5th Cir. Unit A Aug. 21, 1981).

*McDonald* was decided long before *Yu*, and it might appear that our prior panel precedent rule requires us to follow that earlier decision. *See, e.g.*, *United States v. Smith*, 201 F.3d 1317, 1322 (11th Cir. 2000) ("It is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.") (quoting *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir.1993)) (cleaned up). But what might appear is not what actually is.

We're still bound to follow *Yu*, and here's why. The *McDonald* decision held that a Department of Interior adjudicatory rule could not be given retroactive effect because the Department's new interpretation reversed well-established agency practice to "the extreme prejudice," 653 F.2d at 1045, of the plaintiffs and hundreds of other oil and gas lease applicants who relied on the Bureau of Land Management's past practice when they sub-

mitted offers that conformed to that practice but not to the newly adopted one. *Id.* at 1036–37. That earlier decision in *McDonald* does not free us from *Yu* because *McDonald* is distinguishable.

Under the prior panel precedent rule we have a duty to reconcile, where possible, prior precedents that appear to be in tension. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993) ("Given the delicate nature of the task, it is not surprising that one of the most favored means for resolving an inconsistency in circuit precedents is to determine that the inconsistency is more apparent than real. A panel of this Court is obligated, if at all possible, to distill from apparently conflicting prior panel decisions a basis of reconciliation and to apply that reconciled rule."); *see also Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1230 (11th Cir. 2020) (same).

Reconciling our two previous decisions is not difficult here. *Yu* is specific to the immigration context; *McDonald* involves the Bureau of Land Management and the Interior Board of Land Appeals. *McDonald* has its own its facts, including extreme prejudice to hundreds of oil and gas lease applicants, 653 F.2d at 1036, 1045, and any broad statements the opinion made about agency decisions applying prospectively is limited to those facts. *See, e.g., Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.") (collecting cases). The facts in *McDonald* have nothing to do with immigration law. More specifically, the facts in *McDonald*

have nothing to do with 8 U.S.C. § 1103(a)(1) and the Attorney General's rulings and determinations about immigration law. Whatever *McDonald* says generally about agency law and the *Chenery* balancing test, it holds nothing about immigration law. *United States v. Bazantes*, 978 F.3d 1227, 1244 (11th Cir. 2020) ("To the extent that an earlier decision is distinguishable from the case at hand, it may be a prior precedent, but it is not one that can dictate the result of the current case under the prior precedent rule.").

In *Chenery* the Supreme Court reviewed a Securities and Exchange Commission order and held that an agency is not limited to promulgating rules according to its rulemaking authority but also has the authority to establish new rules through adjudicatory orders. *See Chenery*, 332 U.S. at 199–201. In that context the Court stated that when an agency issues an adjudicative decision establishing a new rule, "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles," and "[i]f that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." *Id.* at 203. In *McDonald* our predecessor Court stated that it "accept[ed] the *Chenery* balancing test as the appropriate inquiry" for determining whether the Department of Interior should have applied its new adjudicatory rule to the particular facts of that case. *McDonald*, 653 F.2d at 1043.

Our decision in the present case does not and cannot conflict with *Chenery* because we are bound by the later holding in *Yu*. *Chenery* was decided decades before *Yu*, and if *Yu* overlooked or misinterpreted *Chenery*, that would change nothing about its binding effect on our panel. *See United States v. Fritts*, 841 F.3d 937, 942 (11th Cir. 2016) ("Under this Court's prior panel precedent rule, there is never an exception carved out for overlooked or misinterpreted Supreme Court precedent."); *see also Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001) ("[W]e categorically reject any exception to the prior panel precedent rule based upon a perceived defect in the prior panel's reasoning or analysis as it relates to the law in existence at the time."). And our decision in this case does not conflict with *McDonald*'s application of *Chenery* because, for the reasons we've discussed, *McDonald* is distinguishable from *Yu* and doesn't free us from following *Yu*. *See Bazantes*, 978 F.3d at 1244.

It's not the first time we've followed *Yu* in an immigration case like this one, and some other circuits have done the same. *See Alvarado v. U.S. Att'y Gen.*, 984 F.3d 982, 991 (11th Cir. 2020) ("Once the Attorney General clarified the meaning of the statutory phrase particular social group in *Matter of A-B-*, [27 I. & N. Dec. 316 (AG 2018),] that decision became the controlling interpretation of the law and was entitled to full retroactive effect in all cases still open on direct review, regardless of whether the events predated the Attorney General's decision.") (citing *Yu*, 568 F.3d at 1333) (quotation marks omitted); *accord Torres v. Holder*, 764 F.3d 152, 158 (2d Cir. 2014), *aff'd sub nom. Torres v. Lynch*, 578 U.S. 452

(2016) ("In relying on *Matter of Bautista* [, 25 I. & N. Dec. 616 (BIA 2011)], the BIA therefore did not retroactively apply a new law but instead applied its determination of what the law 'had always meant.'") (cleaned up) (quoting *Yu*, 568 F.3d at 1333); *id.* at 158–59 ("Once *Matter of Bautista* issued, that decision became the controlling interpretation of the law and was entitled to full retroactive effect in all cases still open on direct review, regardless of whether the events predated the decision.") (cleaned up) (quoting *Yu*, 568 F.3d at 1334); *Espinal-Andrades v. Holder*, 777 F.3d 163, 170 (4th Cir. 2015) (same); *Shou Wei Jin v. Holder*, 572 F.3d 392, 397–98 (7th Cir. 2009) (holding that "[a] change in an agency's interpretation of the law does not constitute a 'significant error' that justifies the exercise of our *nunc pro tunc* powers" to apply the BIA's earlier precedent to an asylum claim) (citing and quoting *Yu*, 568 F.3d at 1332); *but see Zaragoza v. Garland*, 52 F.4th 1006, 1023 (7th Cir. 2022) (concluding that retroactive application of the Attorney General's adjudicative decision "can be properly withheld" in some cases "when to apply the new rule to past conduct or prior events would work a manifest injustice") (quotation marks omitted).

As Judge Jordan points out in his separate concurring opinion, the Second and Seventh Circuits have not consistently applied the retroactivity rule from *Yu* and have sometimes taken a *Chenery* balancing test approach. *See, e.g.*, *Lugo v. Holder*, 783 F.3d 119, 121–23 (2d Cir. 2015); *Negrete-Rodriguez v. Mukasey*, 518 F.3d 497, 503–

19-15077                Opinion of the Court                23

04 (7th Cir. 2008).  And they aren't the only circuits that have applied the *Chenery* balancing test in immigration cases.[2]  *See, e.g.*, *De Niz Robles v. Lynch*, 803 F.3d 1165, 1173–78 (10th Cir. 2015); *Francisco-Lopez v. Att'y Gen. U.S.*, 970 F.3d 431, 436–40 (3d Cir. 2020); *Reyes v. Garland*, 11 F.4th 985, 990–93 (9th Cir. 2021).

---

[2]     Our concurring colleague states that because the Attorney General's *Thomas* opinion cites *Chenery* for the proposition that that an agency has the authority to announce new interpretations of a statute through rulemaking or through adjudication, *see Matter of Thomas*, 27 I & N Dec. at 688, we can "presume[]" that the Attorney General also believes that *Chenery* would "govern with respect to the retroactivity of an interpretive change by adjudication." Concurring Op. at 6 n.2.  We disagree.

When a court (or the Attorney General in an adjudicative decision) cites one part of an opinion, that does not amount to an endorsement or agreement with every other part of the opinion.  *Matter of Thomas* pin cites the *Chenery* opinion only for the proposition that rulemaking and adjudication are equally valid paths to the same destination. And *Matter of Thomas* addresses retroactivity only in terms of state court orders that attempt to alter immigration consequences with post hoc changes to criminal convictions and sentences.  *See* 27 I & N Dec. at 677 (referring to "the immigration consequences of state-court orders that retroactively alter a criminal conviction or sentence").  *Matter of Thomas* does not hold or even hint anything about *Chenery*'s balancing test and whether it applies to deciding if decisions of the Attorney General on immigration matters are retroactive.

Relying on and agreeing with a decision is not an all or nothing proposition. If it were, opinions concurring in part and dissenting in part would not exist, yet opinions that do exactly that are abundant in the reporters.  We have all written them.

*Yu* cites 8 U.S.C. § 1103(a)(1), which seems to give the Attorney General the final say on questions of immigration law. In its entirety, that provision states:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

8 U.S.C. § 1103(a)(1); *see also Negusie*, 555 U.S. at 516–17 ("Congress has charged the Attorney General with administering the INA, and a 'ruling by the Attorney General with respect to all questions of law shall be controlling.'"). Section 1103(a)(1), as *Yu* holds, may mean that when the Attorney General announces new a new decision that is a reasonable interpretation of the INA and is entitled to deference, that decision applies retroactively because it is "the Attorney General's determination of what the law 'ha[s] *always* meant.'" *Yu*, 568 F.3d at 1333 (quoting *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 313, n.12 (1994) (explaining that when the Supreme Court interprets a statute in a new way, it isn't changing the law but is declaring what the statute has "*always* meant" and is

clarifying how inferior courts have misunderstood the will of Congress)).

Or interpreting 8 U.S.C. § 1103(a)(1) as giving the Attorney General final authority on the law may be a misinterpretation of the statute.  A better interpretation may be that § 1103(a)(1) actually spells out the Attorney General's absolute authority on determining questions of immigration law only in relation to other immigration authorities who are listed in that provision.  *See* 8 U.S.C. § 1103(a)(1); *see also Ruiz v. U.S. Att'y Gen.*, 73 F.4th 852, 862 (11th Cir. 2023) (Newsom, J., concurring) ("Section 1103(a)(1)'s proviso is best understood, I submit, to empower the Attorney General to make legal determinations that are 'controlling' vis-à-vis other Executive-Branch actors—but not vis-à-vis the courts."). Regardless, for this panel decision's purpose, we have binding precedent on point, and that binding precedent is *Yu.*

As Judge Jordan's concurring opinion recognizes, we're bound to apply the *Yu* retroactivity rule here.[3]  *See* Concurring Op. at 1.  The *Matter of Thomas* decision is based on interpreting the statutory text to enforce its original meaning.  Under *Yu* the BIA's earlier interpretation of the statute does not mean *Matter of*

---

[3]     Like our concurring colleague, we are "not so sure" about what the statute means, *see* Concurring Op. at 13 n.4, but we would not go so far as to say that a statute whose plain text states that a "determination and ruling by the Attorney General with respect to all questions of law shall be controlling," 8 U.S.C. § 1103(a)(1), says nothing about whether his interpretation should be given retroactive effect, Concurring Op. at 13 n.4.

*Thomas* announced new law. Instead, it means that *Matter of Thomas* correctly states what the law always was and how it always should have been applied. *See Yu*, 568 F.3d at 1333. We cannot hold that that it was impermissible for the BIA to apply the Attorney General's *Matter of Thomas* decision.

## B. Statutory Interpretation

As we have mentioned, we review *de novo* questions of statutory interpretation, subject to the principles of *Chevron* deference that are "of special importance" in the immigration context. *Negusie*, 555 U.S. at 517; *see also Arevalo*, 872 F.3d at 1187; *Amezcua-Preciado*, 943 F.3d at 1341; *Yu*, 568 F.3d at 1331. The *Chevron* step one question "is whether the usual rules of statutory interpretation provide a clear answer" to the specific issue presented. *Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1298 (11th Cir. 2018). If the statutory text is unambiguous and "answers the question presented . . . we apply the statute and determine whether the [BIA's] decision complies with the statutory text." *Hincapie-Zapata v. U.S. Att'y Gen.*, 977 F.3d 1197, 1200 (11th Cir. 2020). If the INA "is silent or ambiguous, we proceed to the second step [of *Chevron*], which requires us to determine whether the agency's interpretation is a "permissible construction of the statute.'" *Yu*, 568 F.3d at 1331. "So long as an agency's interpretation is reasonable, it is controlling," and it is reasonable if it is "not arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 1332 (quotation marks omitted).

19-15077                Opinion of the Court                27

Before turning to the statutory text here, we define the specific and precise issue before us, as step one of *Chevron* requires. *See, e.g.*, *Chevron*, 467 U.S. at 843 (asking whether the statute is ambiguous "with respect to the *specific* issue") (emphasis added); *id.* at 862 (concluding "that the legislative history as a whole is silent on the *precise issue before us*") (emphasis added); *In re Gateway*, 983 F.3d at 1256 (noting that at step one of *Chevron* "[w]e must ascertain whether Congress had a specific intent on the *precise question before us*") (emphasis added; quotation marks omitted); *Hincapie-Zapata*, 977 F.3d at 1200 (stating that deference may be due if "the statute is silent or ambiguous with respect to the *specific issue*") (emphasis added; quotation marks omitted); *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1273 (11th Cir. 2009) ("The first question is whether Congress has directly spoken to *the precise question at issue*.") (emphasis added; quotation marks omitted).

In this case, the facts of the state court sentence modification order define the precise issue presented and the outer reaches of our holding. *Cf. Alim v. Gonzales*, 446 F.3d 1239, 1248 (11th Cir. 2006) (holding that a prior decision that had addressed a conviction vacated for a "rehabilitative" reason was not binding in a factual scenario where a conviction had been vacated because of a defect such as a violation of a constitutional right).

The key facts are clear: Edwards' state court sentence was modified so that he could avoid the immigration consequences of being an aggravated felon under federal law, and in that way avoid

removal.  We know that's why his sentence was modified because the state court gave no reasons for modifying Edwards' sentence other than stating that it had considered his motion.  Edwards' motion, in turn, was entirely about his immigration situation and the harsh effect that removal would have on him and his family.  *See* supra at 5, 8.  Neither of his two motions to modify mentioned any other reason for modifying his sentence.

In the closely analogous immigration context of state court orders that vacate a conviction (instead of revising a sentence), we have held that we can look to a petitioner's state court filing to determine "the reason underlying the state court's decision to vacate [his] plea." *Alim*, 446 F.3d at 1251.  We concluded in *Alim* that "we have no reason to doubt that [the] plea was vacated for the reason provided in" the petitioner's request for relief, and that was "particularly so because the state did not challenge or contest [the petitioner's] factual allegations." *Id.*  The same is true here.  The state court granted Edwards' unopposed motion for a sentence modification solely for the reason stated in that motion. One reason and one reason alone: to enable Edwards to avoid removal under federal immigration law.  The question is whether the INA prohibits giving legal effect for immigration purposes to this kind of state court sentence modification order.

We begin our analysis of the meaning of the statute, as we always should, with the text of it.  The relevant text comes from 8 U.S.C. § 1101(a)(48), which is located in the definitions section of the statute.  It states in full:

(A) The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

(B) Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law *regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part*.

8 U.S.C. § 1101(a)(48) (emphasis added).

Our primary focus is on the meaning of a "term of imprisonment or a sentence." *Id.* § 1101(a)(48)(B). The statute partially defines a "term of imprisonment or a sentence" by specifying one thing it is "deemed to include," which is: "the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part." *Id.* We have held that "suspension" takes its federal meaning, which is "a procedural act that

precedes a court's authorization for a defendant to spend part or all of the imposed prison sentence outside of prison." *Ayala-Gomez*, 255 F.3d at 1319. Based on that definition of "suspension," we have interpreted a "term of imprisonment" to "include all parts of a sentence of imprisonment from which the sentencing court excuses the defendant, even if the court itself follows state-law usage and describes the excuse with a word other than 'suspend.'" *Id.*

The partial statutory definition of a "term of imprisonment" and our interpretation of it in *Ayala-Gomez* do not entirely resolve the precise issue before us. Because we have held that a "suspension" is "a procedural act that *precedes*" a court allowing a defendant to avoid spending time in prison, *id.* (emphasis added), that part of the partial statutory definition does not tell us about post-sentencing modifications to an already served sentence.

And though the statute refers plainly to "the period of incarceration or confinement ordered by a court of law," that does not tell us much about the precise issue before us either. 8 U.S.C. § 1101(48)(B). It doesn't because both the original sentence and the modified sentence include a "period of incarceration or confinement ordered by a court of law." *Id.* The question is which period of confinement counts for purposes of immigration law, the original one or the modified one.

The statute does not unambiguously answer that question. But the Attorney General has. *See* 8 U.S.C. § 1103(a)(1); *see also Yu*, 568 F.3d at 1333. And his interpretation on the precise ques-

tion of law at issue here is "reasonable and entitled to deference." *Yu*, 568 F.3d at 1333; *see also Bastias v. U.S. Att'y Gen.*, 42 F.4th 1266, 1274 (11th Cir. 2022) (explaining that at *Chevron* step two the agency has a "range of discretion" to interpret the INA and is free to make a policy-based decision from a variety of possible interpretations).

As we have discussed, *see supra* at 10–11, in *Matter of Thomas* the Attorney General determined that a state court sentence modification order issued for "avoidance of immigration consequences" has no legal effect for immigration purposes. 27 I. & N. Dec. at 674. That determination with respect to this question of law is controlling. *See* 8 U.S.C. § 1103(a)(1); *Yu*, 568 F.3d at 1333. Edwards' sentence modification order was issued *after* he completed his sentence and *after* his removal proceedings began and *only* for the purpose of preventing removal. Because Edwards' modification order did not change his "term of imprisonment" for purposes of federal immigration law, the BIA correctly determined that he is an aggravated felon, and thus removable, and ineligible for cancellation of removal, and ineligible for asylum.

## IV.  DENIAL OF WITHHOLDING OF REMOVAL ISSUE

To qualify for withholding of removal, Edwards must show that if he returned to Jamaica his life or freedom would be threatened on account of his membership in a particular social group. *Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1331 (11th Cir. 2011). He bears the burden of showing that he more likely than not would

be persecuted because of his membership in that social group. *Id.*
The BIA determined Edwards had failed to carry his burden of
showing that likelihood. That determination was a factual one.
*See Malu v. U.S. Att'y Gen.*, 764 F.3d 1282, 1290–91 (11th Cir. 2014)
(explaining that the BIA made a finding "as a matter of fact" that
the petitioner failed to prove that she more likely than not would
be persecuted in the future on account of her membership in a
particular social group). Edwards' challenge to the factual deter-
mination that he failed to prove the likelihood of future persecu-
tion is his only basis for challenging the BIA's determination that
he is ineligible for withholding of removal.

The front gate problem with Edwards' factual challenge to
the order denying him withholding of removal is that we do not
have jurisdiction to review it. *See id.* at 1289 (explaining that "[w]e
lack jurisdiction . . . to review factual findings that an alien is un-
likely to endure persecution" and "to reweigh the evidence that
the agency considered"). We have held that 8 U.S.C.
§ 1252(a)(2)(C) means that the "only relief available to [the peti-
tioner], a criminal alien, is relief predicated on errors of law, not
errors of fact." *Malu*, 764 F.3d at 1290; *accord Guerrero-Lasprilla v.
Barr*, 140 S. Ct. 1062, 1067, 1073 (2020) (holding that under 8
U.S.C. § 1252(a)(2)(D), jurisdiction exists to review "the applica-
tion of a legal standard to undisputed or established facts," but
that provision "will still forbid appeals of factual determinations—
an important category in the removal context"). We also held in
*Malu* that based on the jurisdictional bar in § 1252(a)(2)(C), we
"lack jurisdiction to review the Board's factual finding" that a

criminal alien has "failed to prove that she more likely than not would be persecuted in the future on account of her membership in" a particular social group. *Malu*, 764 F.3d at 1291. That holding, backed up by what the Supreme Court stated in *Guerrero-Lasprilla*, bars our review of Edwards' factual challenges to the BIA's finding that he failed to prove he would be harmed in Jamaica because of his membership in a particular social group. Because Edwards asserts no challenges "predicated on errors of law," *id*. at 1290, we have no jurisdiction to review that part of the BIA's decision denying withholding of removal.

The Supreme Court's decision in *Nasrallah v. Barr*, 140 S. Ct. 1683 (2020), does not change our view about our lack of jurisdiction. *Nasrallah* held that appellate courts do have jurisdiction to review under the substantial evidence standard the BIA's factual determinations leading to an order denying CAT relief. *Id*. at 1690. The Court acknowledged the government's argument that its decision "might lead to judicial review of factual challenges to statutory withholding orders," but it emphasized that the "question is not presented in this case, and we therefore leave its resolution for another day." *Id*. at 1694.

At least until that "another day," we are bound by our prior panel precedent to hold that we lack jurisdiction over factual challenges to orders denying withholding; the *Nasrallah* decision has not overruled or undermined that precedent to the point of abrogation. *See United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc). For a Supreme Court decision to undermine

panel precedent to the point of abrogation, the "decision must be clearly on point" and "*clearly contrary*" to the panel precedent. *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003) (quotation marks omitted). "In addition to being *squarely on point*, the doctrine of adherence to prior precedent also mandates that the intervening Supreme Court case *actually abrogate or directly conflict with, as opposed to merely weaken, the holding* of the prior panel." *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) (emphasis added).

The *Nasrallah* decision about CAT relief orders leaves in force our prior panel precedent about withholding of removal orders. *See Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.*, 475 F.3d 1228, 1230 (11th Cir. 2007) ("Obedience to a Supreme Court decision is one thing, extrapolating from its implications a holding on an issue that was not before that Court in order to upend settled circuit law is another thing."). The *Nasrallah* decision was based on statutory interpretation, and the statutory provisions interpreted in that decision and this one are different. *See* 8 U.S.C. § 1231(b)(3); The Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, § 1242, 112 Stat. 2681-822 (1998); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-627 (1996). Which probably is why the Supreme Court was moved to point out in *Nasrallah* that it was not reaching any holding about orders denying withholding of removal.

Not only that but our post-*Nasrallah* precedent also indicates that our prior panel precedent about withholding orders continues to bind us. *See Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1327 (11th Cir. 2021) (reciting in the same paragraph the rule from *Nasrallah* about CAT relief orders and the rule from our prior panel precedent about withholding orders); *Thamotar v. U.S. Att'y Gen.*, 1 F.4th 958, 967 (11th Cir. 2021) (holding that an "order granting a noncitizen withholding of removal is a final order of removal").

## V.  CAT RELIEF ISSUE

The BIA determined that the IJ "did not clearly err in finding inadequate evidence to support a finding that it was more likely than not that [Edwards] would be tortured in Jamaica." As we've already mentioned, we do have jurisdiction to review under the substantial evidence standard the BIA's factual determinations about the denial of CAT relief. *See Nasrallah*, 140 S. Ct. at 1691. Under that standard we can reverse the BIA only if the record compels it. The record does not.

The definition of "torture" for CAT purposes requires severe pain or suffering that was, among other things, "inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); *see also Todorovic v. U.S. Att'y Gen.*, 621 F.3d 1318, 1324 (11th Cir. 2010) ("[F]or CAT relief, an applicant must show that it is more likely than not that he will be tortured by, or with the acquiescence of, government

officials if returned to the designated country of removal."); *Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1323 (11th Cir. 2007).

Edwards failed to show the likelihood of government involvement or acquiescence in any torture by the Jamaican government. As the IJ found, the Jamaican government had made "efforts to combat corruption in the police and security forces as well as abuses that may rise to the level of torture." The police also took Edwards' statement after he was robbed by gang members. Even if they failed to arrest the perpetrators, we have held that "CAT does not extend so far" as to allow "a person [to] obtain CAT relief merely because he was attacked by a gang of neighborhood thugs whom the police were unable to apprehend." *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004). The record does not compel the conclusion that Edwards has established entitlement to CAT relief.

## VI. CONCLUSION

For all of those reasons, Edwards' petition is **DISMISSED in part DENIED in part**.

19-15077                [JORDAN, J., Concurring]                1

JORDAN, Circuit Judge, Concurring.

I join the court's opinion as to all but Part III.A. With respect to Part III.A, I concur in the judgment, as I agree that we should apply *Yu v. United States Attorney General*, 568 F.3d 1328, 1330 (11th Cir. 2009), because it is directly on point. Nevertheless, the result we reach in Part III.A is, in my view, unsatisfactory. The Supreme Court has told us that the retroactivity of administrative decisions is subject to a multi-factor balancing test, and we have acknowledged that command. *See S.E.C. v. Chenery Corp.*, 332 U.S. 194, 203 (1947); *McDonald v. Watt*, 653 F.2d 1035 (5th Cir. Aug. 21, 1981). In *Yu*, we accorded automatic retroactivity to administrative rulings by the Attorney General in the immigration context, treating such edicts as if they were judicial decisions by Article III tribunals. And we did so without acknowledging, much less discussing, *Chenery* and *McDonald*. I write to explain why we should convene *en banc* to right our circuit law and confirm that, in the world of administrative decisions, the *Chenery* balancing test governs all retroactivity determinations.

**I**

This case concerns the retroactive application of a 2019 ruling by the Attorney General—*Matter of Thomas & Thompson*, 27 I. & N. Dec. 674 (A.G. 2019)—regarding the federal immigration effect of a state court order modifying, clarifying, or otherwise altering the sentence of a convicted noncitizen. In *Thomas*, the Attorney General ruled that, in determining whether an alien has

2                    [JORDAN, J., Concurring]                    19-15077

committed an aggravated felony for purposes of removal under the Immigration and Naturalization Act, 8 U.S.C. § 1101(a)(43)(F), immigration officials should credit state court orders reducing or modifying the "term of imprisonment" for a particular offense only if the reduction was based on a "defect in the underlying criminal proceedings," and not, for example, potential immigration consequences. *See id*. at 674. This determination abrogated the Board of Immigration Appeals' longstanding precedent holding just the opposite—that that immigration officials are required to give full faith and credit to all state court orders modifying sentences, irrespective of their underlying reasons. *See, e.g.*, *In re Cota-Vargas*, 23 I. & N. Dec. 849 (B.I.A. 2005).

*Thomas* had significant potential consequences for Mr. Edwards and his then-pending removal proceedings. Naturally, he argues here that the Attorney General's about-face in *Thomas* cannot be retroactively applied to him. *See* Petitioner's Br. at 11–15. He asserts, for example, that "[a]s a new rule which can bring adverse consequences for immigrants' past legal decisions, the new rule must not apply to modifications of sentence or to positive immigration rulings based on such modifications that occurred before October 25, 2019, the date of publication of the Attorney General's edict." *Id*. at 14.[1]

---

[1] Despite making this argument, Mr. Edwards did not cite to *Chenery* or *McDonald* in his initial brief. Those citations would have been helpful.

19-15077                    [JORDAN, J., Concurring]                          3

In our initial panel opinion, we held that *Thomas* was fully retroactive by applying *Yu*, a case in which we had accorded automatic retroactive effect to an administrative ruling by the Attorney General. And in today's opinion, we explain that, notwithstanding our recognition and application of *Chenery* in *McDonald* more than 40 years ago, *Yu* is the controlling precedent because *McDonald* dealt with a Department of Interior rule and did not involve a decision by the Attorney General.

The result we reach today, and the route we follow to get there, is an acceptable way to harmonize *Yu* and *McDonald*. But as both a doctrinal and practical matter, our resolution is problematic.

### A

On the doctrinal side, *Yu* incorrectly relied on precedent related to the retroactivity standard of judicial rather than agency decision-making. *See Yu*, 568 F.3d at 1333. Judicial decisions generally apply retroactively as a rule, while legislative (and, as we will see, administrative) enactments and determinations are presumptively prospective. *Compare, e.g.*, *Solem v. Stumes*, 465 U.S. 638, 642 (1984), *with, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988). The difference makes sense.

Courts are charged with "say[ing] what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). And "a legal system based on precedent has a built-in presumption of retroactivity." *Solem*, 465 U.S. at 642. *See also Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372

4                    [JORDAN, J., Concurring]                    19-15077

(1910) (Holmes, J., dissenting) (noting that judicial decisions "have had retrospective operation for near a thousand years"). The Supreme Court has suggested that the presumption of retroactivity attaching to judicial decisions inheres in the Constitution's separation of powers. *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993). So have others. *See Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1150 (10th Cir. 2016) (Gorsuch, J., concurring) ("Precisely to avoid the possibility of allowing politicized decisionmakers to decide cases and controversies about the meaning of existing laws, the framers sought to ensure that judicial judgments 'may not lawfully be revised, overturned or refused faith and credit by' the elected branches of government.") (quoting *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

Unlike the executive branch, the federal judiciary comes with some built-in safeguards to protect against abrupt changes in the law, such as the concept of *stare decisis*, the law of the case doctrine, preclusion rules, and—on a broader scale—the lifetime appointment for federal judges, which renders them less inclined to bend to the popular politics of the day. There is also the Supreme Court, which sits at the apex of the federal judiciary and is available to resolve legal conflicts that arise in the lower federal courts. As the Tenth Circuit has noted, the Constitution "invests judges with none of the same 'legislative Power[ ]' to devise new rules of general applicability," and assigns the limited "'judicial Power' . . . not to avowed policymakers and politicians answerable to the people but to judges insulated from partisan influence and

19-15077                    [JORDAN, J., Concurring]                    5

retribution and appointed without term." *De Niz Robles v. Lynch*, 803 F.3d 1165, 1171 (10th Cir. 2015).

On the other hand, administrative agencies sometimes operate in a quasi-legislative way. Much to the chagrin of some members of the judiciary and certain legal scholars, they sometimes "take 'legislative' and 'judicial' forms" despite being "exercises of [ ] the 'executive Power.'" *Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013) (quoting U.S. Const. Art. II, § 1, cl. 1).

In the modern era of the administrative state, Attorneys General and executive agencies are in part tasked with exercising their delegated legislative authority through quasi-judicial proceedings and the use of administrative law judges. *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 387 n.8 (3d Cir. 1994) ("A . . . fundamental difference between agencies and Article III courts is that an agency boasts both judicial and legislative powers. When an agency exercises its legislative powers, neither the 'cases' or 'controversies' prerequisite, nor the rule of stare decisis, rears its head. And, as *Chenery* illustrates, agencies are free to exercise their legislative powers in adjudications."). Because legislation "is rarely afforded retroactive effect," *De Niz Robles*, 803 F.3d at 1169, when an administrative agency or official exercises delegated legislative authority a presumption against retroactivity may also seem to inhere from the Constitution's separation of powers doctrine. *See Reynolds v. McArthur*, 27 U.S. (2 Pet.) 417, 434 (1829) (Marshall, C.J.) ("It is a principle which has always been held sacred in the United States, that laws by

6                    [JORDAN, J., Concurring]                    19-15077

which human action is to be regulated, look forwards, not backwards; and are never to be construed retrospectively unless the language of the act shall render such construction indispensable."); *Stern v. Marshall*, 564 U.S. 462, 484 (2011) ("Article III could neither serve its purpose . . . nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III.").

To the extent that it denies automatic retroactivity to administration decisions, *Chenery* makes sense. "[T]he more an agency acts like a legislator—announcing new rules of general applicability—the closer it comes to the norm of legislations and the stronger the case becomes for limiting application of the agency's decision to future conduct." *De Niz Robles*, 803 F.3d at 1172. [2]

**B**

Then there are the practical problems. With each change of administrations, there come new policies. In the immigration

---

[2] Ironically, the Attorney General in *Thomas*—the decision at issue here—cited to *Chenery*, albeit for the proposition that an agency may decide whether to announce new interpretations of a statute through rulemaking or through adjudication. *See Thomas*, 27 I & N Dec. at 688. It should reasonably be presumed, therefore, that if (in the Attorney General's eyes) *Chenery* controls as to the propriety of an interpretive change by adjudication, *Chenery* would also govern with respect to the retroactivity of an interpretive change by adjudication.

19-15077                [JORDAN, J., Concurring]                7

context such policies—sometimes expressed through the Attorney General's rulings—are often 180 degree turns from settled norms that have widespread effects on then-pending immigration proceedings. This disruptive force is well-documented. *See, e.g.*, Bijal Shah, *The Att'y Gen.'s Disruptive Immigration Power*, 102 Iowa L. Rev. 129, 143–44 (2017) (discussing how "many recent Attorney General decisions can be understood to have . . . suspended the long-term application of statute [ ] or altered the agent's own longstanding practices, including by virtue of partisan employment of the tool [of the referral and review mechanism]"); Joseph Landau, *DOMA and Presidential Discretion: Interpreting and Enforcing Federal Law*, 81 Fordham L. Rev. 619, 640 n.89 (2012) (referring to the Attorney General's review and certification powers as "powerful tool[s] in that [they] allow[ ] the Attorney General to pronounce new standards for the agency and overturn longstanding BIA precedent"); Richard Frankel, *Deporting* Chevron*: Why the Attorney General's Immigration Decisions Should Not Receive* Chevron *Deference*, 54 U.C. Davis L. Rev. 547, 561 (2020) ("Through the certification power, [the Attorney General] can make law, render policy judgments, and implement the administration's immigration policy agenda. Because of the lack of constraints on the Attorney General and the binding effect of his rulings, certification constitutes a 'sweeping' and 'potent' tool for refashioning the landscape of immigration law, with dramatic effects on the millions of noncitizens subject to removal proceedings.").

What this has meant in practice over the last two decades is that existing immigration precedent is subject to change every

four or so years. Indeed, between the last two administrations alone, there have been at least five vacaturs of prior precedential decisions by the BIA or the Attorney General—many of those decisions themselves vacaturs of even earlier precedential decisions. *See, e.g.*, *Thomas*, 27 I & N Dec. at 674, 684–85 (overturning longstanding BIA precedent regarding the applicability of state court orders altering or amending a sentence to immigration proceedings); *Matter of M-S-*, 27 I & N Dec. 509 (A.G. 2019) (overruling *Matter of X-K-*, 23 I & N Dec. 731 (BIA 2005), which allowed asylum-seekers with a positive credible fear determination for persecution or torture to be eligible for a custody redetermination hearing before an immigration judge); *Matter of A-B-*, 28 I & N Dec. 307 (A.G. 2021) (vacating *Matter of A-B-*, 28 I & N 199 (A.G. 2021) (restricting asylum claims based on domestic or gang violence), and *Matter of A-B-*, 27 I & N Dec. 316 (A.G. 2018) (itself overruling *Matter of A-R-C-G-*, 26 I & N Dec. 338 (BIA 2014) (recognizing domestic violence as a basis for asylum)); *Matter of A-C-A-A-*, 28 I & N Dec. 351 (A.G. 2021) (vacating *Matter of A-C-A-A-*, 28 I & N Dec. 84 (A.G. 2020), and directing immigration judges to return to the "longstanding review processes" that the previous Attorney General prohibited); *Matter of L-E-A-*, 28 I & N Dec. 304 (A.G. 2021) (vacating *Matter of L-E-A-*, 27 I & N Dec. 581 (A.G. 2019) (reversing BIA findings and abrogating previous training guidance to immigration officers that a family may constitute a particular social group consistent with existing case law), and instructing immigration judges to revert to the "preexisting state of affairs")); *Matter of Cruz-Valdez*, 28 I & N Dec. 326 (A.G. 2021) (va-

19-15077                [JORDAN, J., Concurring]                9

cating *Matter of Castro-Tum*, 27 I & N Dec. 271 (A.G. 2018)). Even when not expressly vacated or overruled, prior precedent is often stayed or held in abeyance, leaving the rights of many hanging in the balance. *See, e.g.*, *Matter of Negusie*, 28 I & N Dec. 120 (A.G. 2020) (stayed by *Matter of Negusie*, 28 I & N Dec. 399 (A.G. 2021)). One need not be a legal savant to recognize that this state of affairs is tantamount to chaos.

This legal ping-pong has become relatively commonplace, as more recent Attorneys General have used their certification authority at a higher rate. *See* Am. Bar Ass'n, Resolution 121A & Report 2–3, n. 9–14 (Aug. 13, 2019) (chronicling the use of the Attorney General's certification power throughout the Barack Obama and Donald Trump administrations). *See also* Alberto R. Gonzalez & Patrick Glen, *Advancing Executive Branch Immigration Policy Through the Attorney General's Review Authority*, 101 Iowa L. Rev. 841, 857–58 (2016) (describing the historical use of the certification authority, including during the George W. Bush administration). As the American Bar Association noted, "the certification process has been used, as opposed to rulemaking (or legislative recommendations), to establish not only procedural and docket management policies, but also substantive questions of law governing immigration proceedings that have resulted in reversing longstanding precedential decisions . . . ." Am. Bar. Ass'n, Resolution 121A at 2. *See also* Jennifer S. Breen, *Labor, Law Enforcement, and "Normal Times": The Origins of Immigration's Home within the Department of Justice and the Evolution of Attorney General Control over Immigration Adjudications*, 42 Hawai'i L. Rev. 1, 58 (2019) (out-

lining the increasing use of the self-referral mechanism and noting that "[n]ow, self-referral is the *only* way in which the Attorney General asserts his review power and that power is increasingly used to reshape immigration procedure and settled areas of immigration law"). And with the (seemingly) never-ending political polarization of the immigration debate, this trend will likely continue.

I don't voice any opinion on whether these vacillating policy decisions are substantively good or bad (individually or collectively) for the body politic in general or the immigration system in particular. My point is that, in light of these mercurial changes, the notion of automatic retroactivity (á la *Yu*) for Attorney General rulings (and similar administrative decisions of general applicability) seems ill-advised.

### III

In *Chenery*, the Supreme Court instructed us to assess retroactivity in the administrative realm by "weighing" the costs the affected individual or entity would face against the benefits the agency would enjoy. *See Chenery*, 332 U.S. at 199–201. The Court noted that "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *Id.* at 203. This balancing is performed to "assess[ ] the underlying due process and equal protection implications associated with retroactive agency action." *Gutierrez-Brizuela*, 834 F.3d at 1147.

19-15077                [JORDAN, J., Concurring]                11

"When the Supreme Court speaks, we are bound to listen." *Jones v. Smith*, 786 F.2d 1011, 1013 (11th Cir. 1986) (Johnson, J., dissenting). There is no "immigration exception" to the balancing test laid out in *Chenery* for the retroactivity of administrative decisions. In giving automatic retroactivity to Attorney General rulings in immigration matters, and in doing so without acknowledging or discussing *Chenery*, *Yu* erred.

As the majority notes, many of our sister circuits have accorded automatic retroactivity to an Attorney General's ruling in immigration cases like this one. *See* Maj. Op. at 22–23 (collecting cases). That, however, is not the whole story.

First, some of those circuits have also—paradoxically—applied the *Chenery* balancing test in immigration cases. The Second Circuit, for example, has cases applying *Chenery* and cases following the rationale of *Yu* in the immigration context. *Compare, e.g.*, *Torres v. Holder*, 764 F.3d 152, 158 (2d Cir. 2014) (following *Yu*), *with Lugo v. Holder*, 783 F.3d 119, 121–23 (2d Cir. 2015) (applying *Chenery* balancing test), *and Obeya v. Sessions*, 884 F.3d 442, 445–50 (2d Cir. 2022) (same). So does the Seventh Circuit. *Compare Shou Wei Jin v. Holder*, 572 F.3d 392, 297 (7th Cir. 2009) (following *Yu*), *with Negrete-Rodriguez v. Mukasey*, 518 F.3d 497, 503–04 (7th Cir. 2008) (applying *Chenery* balancing test).

Second, just as some circuits have followed the misguided automatic retroactivity approach of *Yu*, others have instead applied the *Chenery* balancing test in immigration cases. These include the Third, Fifth, Ninth, and Tenth Circuits. *See, e.g.*, *De Niz Robles*, 803 F.3d at 1173–78; *Monteon-Camargo v. Barr*, 918 F.3d 423,

12                    [JORDAN, J., Concurring]                    19-15077

430–31 (5th Cir. 2019); *Francisco-Lopez v. Att'y Gen. U.S.*, 970 F.3d 431, 436–40 (3d Cir. 2020); *Reyes v. Garland*, 11 F.4th 985, 990–93 (9th Cir. 2021). The *Yu* approach, therefore, is not universally embraced.

On our end, we have discussed the Supreme Court's *Chenery* analysis in a well-known immigration case, though not with regards to retroactivity. *See Gonzalez v. Reno*, 212 F.3d 1338 (11th Cir. 2000) (citing to and analyzing *Chenery* when discussing the different levels of deference afforded to agency adjudications). We should endeavor to correct course and apply *Chenery* correctly, especially given the sheer volume of immigration cases that come before us.[3]

IV

Incumbent and newly-appointed Attorneys General—sometimes "avowedly politicized administrative [officials] seeking to pursue whatever policy whim may rule the day," *Gutierrez-Brizuela*, 834 F.3d at 1150 (Gorsuch, J., concurring)—are permitted to overturn longstanding immigration rules from one day to the next. And to make matters worse for those litigating in the immigration system (and the lawyers who represent them), the federal

---

[3] *See, e.g.*, Admin. Office U.S. Courts, *Federal Judicial Caseload Statistics 2022* (Mar. 31, 2022), https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2022 ("BIA appeals accounted for 87 percent of administrative agency appeals and constituted the largest category of administrative agency appeals filed in each circuit except the DC Circuit.").

19-15077                [JORDAN, J., Concurring]                13

circuits have applied contradictory analyses on the retroactive effects of those ever-changing policy decisions.

The notion of automatic retroactivity delineated in *Yu* relies on the mistaken premise that a ruling by the Attorney General is a "determination of what the law 'had *always* meant.'" 568 F.3d at 1333 (quoting *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 313 n.12 (1994)). As explained earlier, the Attorney General should not be treated as an Article III federal court for retroactivity purposes. To put it in simple terms, how can the law have *always* meant one thing one day and then have *always* meant the exact opposite come the following election cycle? *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994) (noting that a retroactivity analysis focuses on "considerations of fair notice, reasonable reliance, *and settled expectations*") (emphasis added).[4]

I believe we should convene *en banc* and hold that *Chenery* provides the framework for determining the retroactive effect of the Attorney General's ruling in *Thomas*. Perhaps, in this mad,

---

[4] The court posits that maybe *Yu* can be explained by 8 U.S.C. § 1103(a)(1), the statute which gives the Attorney General the authority to make controlling decisions regarding immigration law. *See* Maj. Op. at 23–25. I'm not so sure. This statute may explain why some deference is due to the Attorney General's interpretation of an ambiguous statute, *see Ruiz v. Att'y Gen.*, 73 F.4th 852, 858 n.3 (11th Cir. 2023), but it says nothing about whether that interpretation should be given automatic retroactive effect by the federal courts.

14                    [JORDAN, J., Concurring]                    19-15077

mad world, the *Chenery* balancing test will provide a dose of sanity and stability.[5]

---

[5] Tears for Fears, *Mad World*, on The Hurting (Mercury Records 1983).